# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 9, 2001 Session

## STATE OF TENNESSEE v. RICHARD HALE AUSTIN

**Direct Appeal from the Criminal Court for Shelby County**
**No. B-58357    C. Creed McGinley, Judge, by designation**

---

**No. W1999-00281-CCA-R3-DD  - Filed March 6, 2001**

---

In 1977, Richard Hale Austin was found guilty by a Shelby County jury of accessory before the fact to the first degree murder of Julian Watkins. Austin's conviction stemmed from his role in commissioning the murder of Watkins, a reserve deputy sheriff. The jury subsequently found the presence of aggravating factor (i)(4), murder for remuneration, and imposed a sentence of death. In 1997, Austin was granted habeas corpus relief in the form of a new sentencing hearing by the Sixth Circuit Court of Appeals. At the re-sentencing hearing, twenty-two years after his original trial, a jury again found the presence of the (i)(4) aggravating factor and again imposed a sentence of death. It is from this sentencing decision that Austin appeals. In this appeal, Austin presents numerous issues for our review, including (1) the disqualification of the Tennessee Supreme Court; (2) challenges to the selection of various jurors; (3) the admission and exclusion of evidence; (4) the introduction of victim impact evidence; (5) prosecutorial misconduct during closing argument; (6) the propriety of the jury instructions; (7) whether application of the (i)(4) aggravator violates <u>State v. Middlebrooks</u>; (8) prejudice due to the delay in imposing a sentence of death; (9) the constitutionality of Tennessee's death penalty statutes; and (10) whether the jury imposed a proportionate sentence. After a careful review of the record, we affirm the imposition of the sentence of death.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Frank J. Glankler, Jr. and Robert L. Hutton, Memphis, Tennessee, for the Appellant, Richard Hale Austin.

Paul G. Summers, Attorney General and Reporter, Michael Moore, Solicitor General, Amy L. Tarkington, Assistant Attorney General, William L. Gibbons, District Attorney General, and John Campbell and Thomas Henderson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The Appellant, Richard Hale Austin, appeals as of right, his sentence of death. In 1977, the Appellant was convicted by a Shelby County jury of accessory before the fact in the premeditated murder of Julian Watkins and was sentenced to death. The Appellant's conviction and sentence of death were affirmed on direct appeal. See State v. Austin, 618 S.W.2d 738 (Tenn.), cert. denied, 454 U.S. 1128, 102 S. Ct. 980 (1981). The denials of his requests for post-conviction relief were likewise affirmed.[1] The Appellant subsequently petitioned for a federal writ of habeas corpus and moved for summary judgment. The federal district court partially granted his motion and issued the writ, holding that (1) trial counsel was ineffective at both the guilt and sentencing phases, and (2) the reasonable doubt instruction was unconstitutional and it was reasonably likely that the jury interpreted the instructions as preventing any juror from considering a mitigating circumstance unless the jury unanimously found that circumstance.[2] Austin v. Bell, 938 F. Supp. 1308 (M.D. Tenn. 1996). The State sought appeal to the Sixth Circuit Court of Appeals from the district court's ruling granting the Appellant relief on the issues of ineffective assistance of counsel and reasonable doubt instruction. The Sixth Circuit reversed the district court's holdings on all grounds with the exception that the court affirmed the district court's finding that counsel was ineffective at the penalty phase. See Austin v. Bell, 126 F.3d 843 (6th Cir. 1997), cert. denied, 523 U.S. 1079, 118 S. Ct. 1526 and 523 U.S. 1088, 118 S. Ct. 1547 (1998). The case was remanded to the Shelby County Criminal Court for a new sentencing hearing.[3]

Upon remand, the State filed notice of its intent to seek the death penalty based upon two aggravating circumstances: (1) that the defendant committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration, or the promise of remuneration; and (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. TENN. CODE ANN. §§ 39-2402(i)(4) and (6) (1977). A new sentencing hearing was held on March 1, 1999. At the conclusion of the sentencing hearing, the jury found the presence of one aggravating circumstance, *i.e.*, that the defendant committed the murder for remuneration or the promise of

---

[1] See Richard H. Austin v. State, No. 02C01-9310-CR-00238 (Tenn. Crim. App. at Jackson, May 3, 1995), perm. to appeal denied, (Tenn. Nov. 6, 1995); Richard Austin v. State, No. 02C01-9102-CR-00009 (Tenn. Crim. App. at Jackson, Aug. 14, 1991), perm. to appeal denied, (Tenn. 1991); Richard Hale Austin v. State, No. 17 (Tenn. Crim. App. at Jackson, Dec. 10, 1986), perm. to appeal denied, (Tenn. 1987); Richard Hale Austin v. State, No. 33 (Tenn. Crim. App. at Jackson, Apr. 17, 1985), perm. to appeal denied, (Tenn. 1985).

[2] In a subsequent opinion, the district court rejected several other issues raised by the Appellant in his habeas petition. See Austin v. Bell, 927 F.Supp. 1058 (M.D. Tenn. 1996).

[3] Chief Justice Anderson, pursuant to his authority under TENN. CODE ANN. § 17-2-116, designated the Honorable Creed McGinley to preside over the Appellant's re-sentencing.

remuneration or employed another to commit the murder for remuneration. The jury further determined that the mitigating circumstances did not outweigh the aggravating circumstance and imposed a sentence of death. The trial court approved the sentencing verdict. The Appellant appeals presenting for our review the following issues:

I. Whether the trial court erred by denying the Appellant's motion to disqualify the Tennessee Supreme Court and/or the State Attorney General from future proceedings in this case and whether the court erred in quashing subpoenas issued by the Appellant regarding this claim (Appellant's Issues III and IV);

II. Whether the trial court properly controlled the selection of numerous jurors (Appellant's Issues VI and XVI);

III. Whether the trial court erred by refusing to admit substantive evidence on the grounds that such evidence was hearsay (Appellant's Issues I and V);

IV. Whether the trial court erred by admitting testimony of Marilyn Lee Pryor recalling threats of violence against her by the Appellant (Appellant's Issue XVII);

V. Whether the trial court erred by permitting the State to cross-examine Levi Haywood as to the treatment of "snitches" in the jail (Appellant's Issue XVIII);

VI. Whether the trial court erred by compelling Jack Blankenship to testify (Appellant's Issue XIX);

VII. Whether the introduction of victim impact evidence constituted error (Appellant's Issue XIV);

VIII. Whether the State committed prosecutorial misconduct during closing argument by commenting on matters not in evidence (Appellant's Issue VII);

IX. Whether the trial court erred by refusing to instruct the jury as to the fairness of the imposition of a sentence of death in light of the sentences received by co-defendants Terry Casteel and Jack Charles Blankenship (Appellant's Issue II);

X. Whether the trial court properly refused to instruct the jury to consider a sentence of life without the possibility of parole as a sentencing option (Appellant's Issue IX);

XI. Whether the trial court properly refused to instruct the jury regarding parole eligibility and properly addressed the jury's question regarding parole eligibility (Appellant's Issue XV);

XII. Whether the application of aggravating circumstance (i)(4), murder for remuneration, violates State v. Middlebrooks (Appellant's Issue XIII);

XIII. Whether the trial court properly refused to impose a life sentence in light of the twenty-year delay in the imposition of a sentence of death (Appellant's Issue VIII);

XIV. Whether Tennessee's death penalty statutes are constitutional (Appellant's Issue XII); and

XV. Whether the jury imposed an arbitrary and disproportionate sentence (Appellant's Issues X and XI).

After review, we find no error of law requiring reversal. Accordingly, we affirm the jury's imposition of the sentence of death.

## Factual Background

For background purposes, we have excerpted, from the opinion of the Sixth Circuit Court of Appeals, the following summary of facts establishing the Appellant's guilt for the 1977 murder of Julian Watkins:

> In early 1977, the [Memphis Police Department] suspected illegal gambling at [the Appellant's] pool hall and employed [Julian C.] Watkins, a reserve deputy sheriff, to investigate. Based on Watkins' testimony, the [S]tate obtained indictments and arrest warrants for Austin, his wife, and several employees and associates, including Terry Casteel, the manager of the pool hall. Watkins was to be the chief witness against them.
>
> After their arrests, Austin, [Jack Charles] Blankenship, and Casteel met. During their meeting, Austin and Blankenship spoke separately, Austin then asked Casteel to drive Blankenship to Watkins' house. Casteel and Blankenship did not find Watkins there, but returned on the morning of May 23, 1977, when Blankenship killed Watkins. After the murder, Blankenship was seen with a large sum of money. The police arrested him on May 24, 1977. Blankenship pleaded guilty and was sentenced to life in prison.
>
> Austin and Casteel were indicted for murder. Their trials were severed after Casteel agreed to testify for the State that Austin hired him to kill Watkins.

Austin, 126 F.3d at 845 n. 1.

-4-

## Proof at the Re-Sentencing Hearing

On March 1, 1999, a re-sentencing hearing was held in the Criminal Court of Shelby County. Carolyn Watkins-Cupp, the widow of the victim, testified that she and Julian Watkins had been married for sixteen and one-half years and had three children together at the time of his murder in 1977.[4] Julian Watkins owned Shelby Body Works, a body shop and wrecker service. Ms. Watkins-Cupp described Julian Watkins as "a very loving man. . . . He was generous. He was a hard worker." Julian Watkins was also very involved in the Shelby County community, performing charitable work and volunteering as a reserve deputy with the Shelby County Sheriff's Department. Ms. Watkins-Cupp testified that his murder "devastated" their family. "It's left a big void in our lives." Specifically, she explained that she met the victim when she was ten years old. The two "grew up together. Went to school together. Church together. They lived next door to us." Ms. Watkins-Cupp added that her children have struggled to understand what happened and "why their daddy was no longer there." Ms. Watkins-Cupp stated that her husband's murder forced her to close their business at the end of 1977.

Ms. Watkins-Cupp recalled the events of May 23, 1977. On this morning, she woke the children, fed them, and took them to school at Glenmore Academy. Meanwhile, Julian Watkins drove to work at the Shelby Body Works. She then drove to a local carwash to have the automobile cleaned. While at the carwash, Ms. Watkins-Cupp received a call from one of their employees via a two-way radio requesting that she come to the shop. When she arrived at the business, one of the employees informed her that her husband had been shot. She was then escorted outside where the body of her lifeless husband lay slain on the ground.

Bart Watkins, the victim's son, testified that he was twelve years old at the time of his father's murder. Bart Watkins recalled that on the preceding evening of May 22, 1977, at approximately 10:30 p.m., he and his two brothers were alone at the family's residence on Homewood Road when a man knocked on their door. The children were not alarmed because, at that time, Julian Watkins had a storage lot for cars behind the house and it was common for people to come and get things out of their vehicles. Randy, the oldest son, answered the door. The man asked whether Julian Watkins lived here. Randy responded affirmatively and the man replied that he was having car trouble and that he needed his vehicle towed. Randy informed the man that his father was not at home but that he could "get [him] a wrecker if [he] need[ed] someone to tow [his] car." The man asked to use the telephone. Randy escorted the man to the unattached garage where the man was permitted access to a telephone. The man talked on the telephone for about five minutes. He informed Randy that he no longer needed a tow and then he left. Bart recalled that the man was driving a white Ford sedan.

---

[4]Ms. Watkins-Cupp stated the present ages of their children: "Randy is thirty-seven. Bart is thirty-three. And Steve is thirty." The children were fifteen, eleven, and eight years of age, respectively, at the time of their father's murder.

The following day, May 23, Ms. Watkins-Cupp picked her three children up from school and drove to the family's residence. Once inside the house, Ms. Watkins-Cupp explained to the children that their father had been murdered. At this time, Randy informed his mother of the man who was at the residence the previous evening. The investigating officers subsequently questioned the children as to the identity of their unidentified visitor. From Randy and Bart's description of the visitor, police officers were able to draw a composite of the man using an Identikit. Bart and Randy Watkins also later recognized the man from a police line-up. This man was identified as Jack Charles Blankenship.

Floyd Alton Cupp, a retired officer from the Memphis Police Department, testified that in May 1977, he was assigned to the Vice Squad working on a gambling investigation at The Golden Cue. Poppy Popenheimer owned The Golden Cue and the Appellant, Richard Austin, managed the club. Because Cupp was easily recognizable as law enforcement, Julian Watkins, a fully commissioned reserve deputy, was asked to work undercover for the police department. As part of his undercover assignment, Julian Watkins would frequent The Golden Cue, where he would shoot pool, play cards and gamble when the opportunity arose. As a result of Watkins' visits to The Golden Cue, officers recorded numerous accounts of illegal gambling activity.[5] Eventually, the police officers asked that indictments be returned against individuals at the establishment, including the Appellant.[6] Armed with the indictments, members of the Vice Squad conducted a raid of The Golden Cue on April 20, 1977. Upon executing the raid, officers discovered the Appellant, Julian Watkins, and another individual in a back office playing Three Card Monte.[7] At this time, Julian Watkins identified himself as a police officer. Mr. Cupp stated that, without the testimony of Julian Watkins, there would be no case against the Appellant. Mr. Cupp admitted that the gambling charges against the Appellant and the others were relatively minor criminal offenses.[8] Notwithstanding, a person convicted of gambling charges is unable to hold an amusement license.

Through the testimony of Sandra McClain, a clerk for the Criminal Courts of Shelby County, the State introduced indictments charging the Appellant with numerous gambling offenses occurring on dates between February 24, 1977, and March 5, 1977. Of particular note is indictment B-57321, charging the Appellant and B. J. Popenheimer, "as operators of premises located at 1803 Winchester

[5]"All of these undercover investigations that Mr. Watkins participated in with these various sixteen or seventeen people, basically they're people playing pool against one another, sometimes for a couple of hundred dollars or sometimes for ten dollars or there were card games and some people playing dice together." "[T]here was no casino with a whole bunch of people betting at a crap table or anything of that nature."

[6]Indictments were requested on March 31, 1977. The resulting indictments, returned on April 19, 1977, named seventeen persons as being involved in illegal gambling at The Golden Cue.

[7]Mr. Cupp explained that Three-Card Monte is a card game involving one red ace and two black aces. The object is to "pick which one is which."

[8]During cross-examination of State's witness, Sandra McClain, the defense team elicited that other co-defendants charged with the same type gambling offenses received punishments as minor as a two hundred and fifty dollar fine.

Road . . . , [with] unlawfully and knowingly maintain[ing] a gambling premises . . . " and indictment B-57992, charging the Appellant and Joann Skelton Austin with "keeping a room at 1803 Winchester . . . as owners for the purpose of aiding and assisting the playing of a game of Three Card Monte. . . ." See generally TENN. CODE ANN. § 39-2004.

Richard W. Jewell, a communications supervisor with the Bartlett Police Department, testified that in 1977, he was employed with the Shelby County Sheriff's Department. On May 23, 1977, Jewell and his partner were dispatched to the Shelby Body Works at 8:56 a.m. Upon arriving at the location, Officers Jewell and Swain observed the body of Julian Watkins with several small caliber gunshot wounds to his head, neck, chest, and stomach area. After the officers secured the scene, one of the employees provided the officers with a description of the assailant.

Memphis Police Lieutenant Otis Anderson was assigned to uniform patrol on May 24, 1977, along with his partner Officer Danny Presley. At approximately 1:00 a.m. that morning, the officers made a traffic stop of a vehicle because the driver was suspected of driving under the influence. The officers noticed a strong odor of alcohol on the driver's breath. The driver subsequently failed a field sobriety test. After the driver exited the vehicle, the officers found a loaded .22 caliber pistol under the driver's side seat. The driver identified himself as Jack Charles Blankenship and attempted to bribe the officers with one thousand dollars to let him go. Lieutenant Anderson recalled that an individual named Jack Charles Blankenship had recently escaped from the penal farm.[9] Additional investigation revealed that the license plate on the vehicle driven by Blankenship did not match the vehicle.

Mike Bonham, a former detective with the Shelby County Sheriff's Department, was assigned to investigate the murder of Julian Watkins. Bonham was informed of Blankenship's arrest and visited him at John Gaston Hospital. Bonham recognized Blankenship from the composite provided by the Watkins children. He also discovered that the license plate on the vehicle driven by Blankenship had been altered by use of a magic marker from 1BN202 to 1BN808. Although never implicated by Blankenship, the Appellant surfaced as a suspect in Watkins' murder on May 25, 1977.

Marilyn Lee Pryor was employed as a cashier/cook at The Golden Cue in May 1977. Ms. Pryor testified that the Appellant was her employer and he permitted her to sleep in one of the rooms at the club. Julian Watkins was never mentioned at the pool hall as being the person responsible for the April 1977 raid. Indeed, it was not until Julian Watkins came into The Golden Cue sometime after the raid that Ms. Pryor learned of his law enforcement identity. After this visit, the Appellant "was laughing and carrying on about how cute Mr. Watkins looked. He had a gun and he even made the comment to me at that time that he was an S-O-B, and that he should have his brains shot out."

---

[9]Blankenship was serving a sentence for a previous murder prior to his escape.

Pryor recalled that on the night prior to the murder of Julian Watkins, a man fitting the description of Jack Charles Blankenship came into The Golden Cue. He later left with Terry Casteel, a manager at the club, and the Appellant.[10] Prior to daylight, the Appellant returned to the club alone. Terry Casteel returned the next morning and he and the Appellant left. The Appellant told Ms. Pryror that "he . . . and Terry had to take care of some business, and he would come back, and when he came back I could go home." Later that day, two Vice Squad officers came in The Golden Cue, inquiring as to the Appellant's whereabouts. The Appellant was not there. The officers then questioned Ms. Pryor as to whether a man about five feet tall with brown hair had been into the club. When she responded affirmatively, the officers informed her that she would be subpoenaed to come to the Shelby County Court for a statement. That evening, Ms. Pryor received a phone call from the Appellant during which he told her not to worry about the subpoena because she did not know anything. The next morning, Terry Casteel and Mary Scivilia came to The Golden Cue, woke Ms. Pryor, and told her that they were taking her to her home in Greenwood, Mississippi. Ms. Pryor informed them about the subpoena, but they assured her that she did not have to go. Upon reaching Greenwood, Pryor notified the police officers of her whereabouts; the officers drove to Mississippi to retrieve Ms. Pryor. After testifying on behalf of the State, Ms. Pryor was subsequently contacted by the Appellant at her home in Greenwood. When she informed him that she had provided a statement, the Appellant told her that "[she] was a stupid, cold, bitch and that [she] should have been killed, too."

Terry Lee Casteel testified that, in 1977, he entered a guilty plea to the murder of Julian Watkins and received a sentence of twenty years. He was paroled after serving six years of this sentence. Casteel related that, in the spring of 1977, he came to Memphis from Arkansas.[11] Upon arriving in Memphis, Casteel rented a motel room and went to a few pool halls. He learned that the Appellant, a well-known pool player, owned The Golden Cue. Casteel secured employment at The Golden Cue, assisting the Appellant with managerial duties. Casteel testified that he was present on the day The Golden Cue was raided by the police and was present when the Appellant was arrested. The Appellant's wife, Joann, was also arrested for running a gaming establishment. Casteel subsequently was able to bail Joann Austin from jail with funds on hand at the club. Joann was then able to secure sufficient funds to make the Appellant's bail. After the raid, business at The Golden Cue suffered and the Appellant was visibly upset, blaming Julian Watkins for his troubles. Specifically, the Appellant expressed his concern over a possible penal farm sentence. He commented that, "I need to do something about it. I need to take care of him."

One night, at the Appellant's residence, the Appellant asked Casteel about committing an undetectable murder. Casteel replied that he would probably get a cross bow, because it would be silent and hard to trace. The Appellant asked where he could purchase a cross bow and discussed contacting Troy Bullock. A cross bow was never purchased. Shortly after the attempt to purchase

---

[10]Ms. Pryor admitted that she and Terry Casteel were engaged to be married prior to the victim's murder. By October 1977, they had ended their engagement.

[11]Prior to moving to Memphis, the Appellant resided in Scranton, Arkansas, with his wife and his four children. Because of marital difficulties, Casteel left Arkansas and came to Memphis.

a cross bow, the Appellant received a telephone call informing him that Jack Charles Blankenship was in town and that he had escaped from prison. Subsequently, the Appellant arrived at The Golden Cue and announced to Casteel that he was going to meet somebody at Lamar and Pendleton. The Appellant also advised Casteel that, if he was not back by a certain time, "tell Joann where I went." Casteel, concerned for the Appellant's safety and with the Appellant's approval, decided to accompany the Appellant. The Appellant was driving his 1976 Cadillac. Arriving at Lamar and Pendleton, the Appellant pulled into the parking lot of a lounge and the two men waited. Shortly thereafter, Jack Charles Blankenship arrived and got out of his vehicle. Blankenship and the Appellant confirmed each other's identity. The men proceeded back to The Golden Cue, where the Appellant introduced Casteel as his brother. After about fifteen minutes, the three men went inside. The Appellant and Blankenship proceeded to the Appellant's office. Casteel remained outside. After about thirty minutes, the two men emerged. Blankenship commented that he was tired and needed a place to stay. The Appellant informed Blankenship that his wife owned a trailer in Mississippi. He then instructed Casteel to drive Blankenship to the trailer. As the men left Memphis in a 1972 dark-blue Ford LTD,[12] Blankenship asked Casteel to show him where Julian Watkins lived. The men also stopped at a store so Blankenship could purchase a case of beer. Despite directions from the Appellant, Casteel and Blankenship were unable to find the trailer. Casteel called the Appellant who advised Casteel that he would drive down there and show him the way to the trailer. The Appellant, accompanied by Joann, arrived and directed Casteel and Blankenship to the trailer. The Appellant, Joann, and Casteel left Blankenship at the trailer and returned to the Appellant's residence.

At 6:30 a.m. the following morning, Casteel was awakened by the Appellant and the two men drove to the trailer. Once at the trailer, the Appellant asked Casteel to drive Blankenship to Watkins' body shop. At the business, Blankenship exited the vehicle and entered the shop. Approximately three minutes later, Blankenship came out of the shop accompanied by Julian Watkins. The two men walked back to the vehicle. Julian Watkins was standing at the front of the car and bent over as if he were looking for damage of some kind. As Watkins raised up, Blankenship pulled the gun out of his pocket and shot Watkins in the temple. Blankenship fired five more shots at the victim's neck and chest. The gun was emptied before Julian Watkins "hit the ground." Blankenship got back inside the vehicle and Casteel pulled out of the parking lot, heading back toward the trailer.

The Appellant was waiting at the trailer when Casteel and Blankenship returned. Blankenship reported to the Appellant that he "[didn't] have to worry about the son of the bitch no more." Blankenship added that "[it] felt good to kill that snitching son of a bitch." The Appellant then paid Blankenship one thousand dollars. Blankenship counted the money, put it in his pocket, and then reloaded his gun. The Appellant and Casteel drove back to The Golden Cue. A few days after the murder, the Appellant advised Casteel that he was wanted for questioning and that he should leave town. Casteel complied and initially went to Florence, Alabama. Casteel eventually made his way to Florida, where he received a telephone call from the Appellant's wife. Shortly after

---

[12]Casteel testified that he had changed the 202 on the license plate to 808 with a magic marker after Julian Watkins was murdered.

receiving this telephone call, Casteel returned to Memphis. On January 6, 1978, Memphis Police Officers arrested Casteel. At the time of his arrest, Casteel denied any knowledge of the murder of Julian Watkins. Several days after his arrest and upon being informed that he would be released due to lack of evidence, Casteel informed officers about the murder.[13]

As mitigation evidence, the Appellant presented evidence that co-defendant Terry Casteel, who was charged with first degree murder and accessory before the fact of murder for the death of Julian Watkins, entered a guilty plea to second degree murder on February 2, 1978. Casteel received a sentence of twenty years confinement. The Appellant also introduced the testimony of Levi Haywood. Haywood had met Terry Casteel at the Shelby County Jail, where both were incarcerated. Casteel informed Haywood that he had been beaten by the police because he refused to implicate the Appellant in the murder of Julian Watkins. Casteel admitted to Haywood that he later implicated the Appellant to save himself from "burning." He also conceded that he regretted "ly[ing] on that dude." Haywood testified that he and the other inmates knew that Casteel was a "snitch." He admitted that a "snitch" "may get beat up" and they may even be killed while in prison.

James D. Causey, a Shelby County attorney, testified that in 1977, he was asked to review the indictments of the Appellant with respect to the gambling charges. Mr. Causey stated that the Appellant was indicted for both professional gambling and for gaming. It was his opinion that the State's case against the Appellant on these charges was not strong and "it would have been very difficult . . . to have gotten a conviction of [the Appellant] for professional gambling." Notwithstanding, Causey continued, had the proof been such to warrant a conviction, neither crime was considered a "serious" offense and the likely punishment would merely be a fine.[14] On cross-examination, Mr. Causey conceded that "nine times out of ten," gambling charges are settled without a trial and the agreed punishment is a fine. He also admitted, however, that a person could lose their business license if convicted of a gambling offense.

Joann Austin Skelton, the Appellant's former wife, admitted that the Appellant's brother, A.C. Austin, had threatened her in the past; specifically, after the Appellant was charged with the murder of Julian Watkins and the Appellant and Joann separated. She recalled nothing about the murder. She did admit that the business license to The Golden Cue was originally in her name and was later transferred to Joe Popenheimer. She stated that, as far as she knew, the license was never in the Appellant's name.

Gloria Shettles, a private investigator employed by the Appellant's defense counsel, testified that from 1976 until 1990 she was employed by the Board of Paroles. Although she was not his parole officer, Ms. Shettles did have occasion to prepare a report on Terry Casteel's behalf. She stated that Casteel was taken into custody on July 6, 1977, and pled guilty on February 20, 1978.

[13]Casteel testified at the Appellant's first trial in October 1977. Casteel was still charged with first degree murder at this time. Casteel eventually entered a guilty plea to second degree murder.

[14]Mr. Causey related that he could not recall any case "where anybody accused of gambling [was sentenced to] the five year maximum that you could get."

Shettles admitted that Casteel was not paroled early but had served the requisite percentage.[15] Ms. Shettles further testified that Terry Casteel's prison file contained two letters, one dated February 2, 1978, by the District Attorney General's Office, expressing that, after Casteel had served four to five years of good time in the penitentiary, "we would not oppose executive clemency," although the District Attorney's Office would not initiate clemency. The second letter, dated March 28, 1984, also from the District Attorney General's Office to the State Board of Pardons and Paroles, related that, in the Board's consideration of early release for Mr. Casteel, the Board should remain cognizant of Casteel's cooperation in the State's prosecution against the Appellant and also that Casteel's role in the murder of Julian Watkins was "less substantial then [sic] that of either of his co-defendants, and that to the best of our knowledge, Mr. Casteel has no significant prior criminal behavior."

Troy Bullock, a resident of Jonesboro, Arkansas, testified that in 1977, he was the manager of Terminex in Arkansas when the Appellant introduced him to Terry Casteel. He stated that he and the Appellant discussed "big stakes" gambling at various Jonesboro locations. Four or five days after this initial meeting, Terry Casteel telephoned Bullock and inquired about a cross bow. When Bullock asked why Casteel needed a cross bow, Casteel replied, "I got some silent hunting to do." Bullock informed Casteel that cross bows were illegal and stated that he did not want to get involved. Several weeks later, Bullock attended a quarterly Terminex meeting in Memphis. At this meeting, Bullock received a message to contact Jack Charles Blankenship. Bullock knew Blankenship from his childhood and also knew that he had escaped from prison. After his meetings were concluded for the day, Bullock went to The Golden Cue. Because the Appellant was not at the club on this occasion, Bullock told Casteel about his message from Blankenship and his concerns over contacting him. He informed Casteel that Blankenship was a convicted murderer who had escaped from prison. Bullock stated that he had too much at stake to risk contacting Blankenship. He wadded up Blankenship's telephone number and "dropped it." Casteel picked the paper up and stated "I will take care of this. . . . I'm taking care of Richard's business."

Brenda Morrison is employed at Riverbend Maximum Security Institution as an inmate relations coordinator. Ms. Morrison testified that the Appellant is housed in the unit she is assigned to oversee. She first encountered the Appellant in the 1980's while still at the Main Prison, "the old Tennessee State Penitentiary." The Appellant spent twelve years at the Main Prison, which was later closed by court order due to its state of disrepair. The Appellant was the first man on death row at the Main Prison. Morrison testified regarding the conditions at the Main Prison:

> . . .the conditions were very bad. . . .[T]he heat in the summer-time was very, very, bad. The coldness in winter-time, I've had inmates tell me they had to chip ice out of their toilets to be able to flush them. . . .
>
> A lot of [inmates] would put like pieces of cardboard over the top of their toilet and set their trays on top of that [to eat].

---

[15]Terry Casteel was paroled July 24, 1984.

Morrison added that the Main Prison had problems with both rodents and roaches. The Appellant was first assigned to Unit One, administrative segregation. In Unit One, an inmate would spend twenty-three hours a day in his cell. The Appellant never complained nor was he ever a disciplinary problem. Once transferred to Unit Six, the Appellant would get one hour for exercise. Eventually, he was able to stay out a little bit longer. In October 1989, the Appellant was transferred to the new facility at Riverbend.[16] At the new facility, the Appellant works as a teacher's aid. "He helps students with their GED program, like a tutor. And helps students get ready for taking the GED test." Additionally, she has observed the Appellant to be "very respectful" to herself and to other officers. She further commented:

> Richard Austin is a very good inmate. He has never been a problem for management. He gets along well with his peers. He tries to help other inmates. Even back a few months back, I'm not sure exactly when the date, because there's '96 there, he had his father die and his brother die, and even through all that, that was like within a five-day period, he was still trying to help other inmates with their schooling. So he's very dedicated to helping, you know, his peer group with their education.

Charles Tracy, a correctional teacher at Riverbend, stated that he has been acquainted with the Appellant since 1984. The Appellant now works for him at the prison as a teacher's aid. As part of his job duties, the Appellant is responsible for delivering lessons to individual students in his pod, conducting classes, and assisting students if they have problems.

The video taped depositions of Hardin Green and John Owen were introduced for the jury. Hardin Green and John Owen are retired correctional officers from the Tennessee Department of Correction. While employed, both men were assigned to death row at the Tennessee State Prison in Nashville. In addition to relating the Appellant's exemplary behavior, the former guards explained how the Appellant protected the guards during a prison riot that occurred in 1985. At this time, inmates in the general population started a riot and gained control of the interior of the prison. When the inmates on death row heard the rioting prisoners, "Steve Pickle," a death row inmate, started a fire. Meanwhile, inmates from the general population were trying to gain access to death row. The Appellant told the inmates from the general population, "we don't need you in here. We don't want you in here, we don't want our officers hurt, we are appealing our stuff and you are going to sentence us to the death penalty if you come in here. . . ." Both Hardin Green and John Owen opined that the Appellant not only saved their lives that day but also the lives of the five other officers assigned to death row.

T.J. Walker, an inmate serving a life sentence at the Northeastern Correctional Facility, testified that he resided on death row at Riverbend Prison with the Appellant between 1990 until

---

[16]Morrison admitted on cross-examination that, at Riverbend, death row inmates work six hours a day, thirty hours a week. In addition, they have recreation time and, occasionally, have group meals and religious programs. Inmates are also allowed to sign up at least three times a week for access to the law library and are also permitted televisions in their cell, with no restriction on television usage.

1998. During this time, the Appellant tutored Walker in preparation for the GED examination. The Appellant was well-respected by the other inmates. When a new inmate would come onto the pod, the Appellant would assist them in any way he could. In some situations, if the new inmate did not have any possessions, the Appellant would order them something from the store. Walker recalled that at one point, as a result of gambling, another inmate became indebted to Walker in the amount of six hundred sixty-five dollars. At some point, the other inmate told Walker to "chalk it"[17] and called him some derogatory names. Walker made up his mind to kill this inmate. The Appellant, however, discouraged Walker's intentions. Walker testified that the Appellant's actions in this instance were indicative of his role as a peacemaker on death row.

Jack Charles Blankenship testified that, contrary to his prior statements, he met Terry Casteel and the Appellant on the evening prior to the murder of Julian Watkins. Blankenship confirmed Casteel's version of the events surrounding the murder, recanting his previous version of the facts in which he denied any involvement of the Appellant in soliciting the murder of Watkins.[18] Blankenship testified that, after the Appellant paid him $980 for the murder,[19] he "ditched the car . . . ," purchased a sandwich, and called a cab. Later that evening he returned for the vehicle. Blankenship then "just started boozing it up. Going from one beer joint to another." He met a woman at the Mousetrap who later gave him a place to sleep that night. Blankenship was arrested the next afternoon. Sandra McClain, a clerk for the Criminal Court of Shelby County, introduced records reflecting that Blankenship was charged with the premeditated murder of Julian Watkins. Blankenship entered a plea of guilty and was sentenced to life in the state penitentiary.

Reverend Joseph Ingle, a minister with the United Church of Christ, testified that he has been engaged in prison ministry since 1974. He stated that he has had a pastoral relationship with the Appellant for almost twenty-two years. He remembered the Appellant as being the "first prisoner [in the Tennessee State Prison] in what was called the new death row, because the old law was struck down in 1977." Reverend Ingle added that the prison was built in 1898 and proceeded to describe the antiquated conditions at the former facility. He corroborated the testimony of correctional officers that the Appellant never complained about the conditions. Reverend Ingle added that at the new facility, Riverbend, the Appellant has reached "A" level classification because of his exemplary behavior. He explained that "A" level entitles an inmate to participate in classes and a data entry program. In describing the Appellant, Reverend Ingle stated, "[The Appellant] doesn't wear his religion on his sleeve. He practices it. He's a very kind man, and he's deeply respected by everybody on death row, and admired by everyone, because of the quality of life he's lived since he's not only been at Riverbend, but also on death row at the Tennessee State Prison."

---

[17]Walker explained that "to chalk it means I'm not paying you."

[18]On redirect examination, Blankenship explained that, at the time he denied the Appellant's involvement in the murder, he thought he was being a "stand-up person, and a snitch couldn't live in the penitentiary."

[19]Blankenship explained that the Appellant subtracted twenty dollars from the contracted price of the murder for a case of Schlitz brand beer that he had purchased for Blankenship the previous evening.

Jimmy Edwards Jr., the eighteen-year-old great-nephew of the Appellant, testified that he frequently visits his uncle in prison. He described his uncle as being "one of the nicest guys I've ever met. To think that he did what he was convicted of, is just unconscionable. I don't think he did it. He's caring. He's gentle." Marcia Birdsong, the Appellant's stepdaughter, testified that during the five years that her mother, Joann, was married to the Appellant, the Appellant was a "great stepfather." She described the Appellant as "kind and so generous and honest." She recalled that her mother's parents were elderly and did not have running water nor bathrooms in their home. The Appellant had plumbing installed in their home. When her grandfather was dying, the Appellant bought him a new bed so that he would be more comfortable. More recently, the Appellant offered her comfort after her husband died of leukemia. Midge Edwards, the Appellant's sister, testified that she and the Appellant were two of eight children in their family. The Appellant was the fourth child born. She stated that the Appellant liked to watch ball games and playing pool was his favorite thing. In fact, he was "real good" at playing pool and "he's even played with Minnesota Fats a long time ago." Ms. Edwards also explained that the Appellant is a diabetic and has a lot of problems with his blood sugar. Jimmy Edwards, the Appellant's nephew, testified that he was twenty-three years old when his uncle was sent to prison. He explained that, while he was growing up, he had been very close to his uncle.

Dr. Mark Cunningham, a clinical and forensic psychologist, testified that he evaluated the Appellant relative to the Appellant's "prison adjustment" and the influence that he has upon other inmates in the prison setting. As a result of his evaluation, Dr. Cunningham opined that

[r]egarding the likelihood of his making a continued positive adjustment to a prison setting, I think the likelihood of that is very high that he will continue to have a good adjustment to incarceration. Regarding his likelihood of committing acts of serious violence while incarcerated. I think the likelihood of that is low to very low. Regarding the impact that he is likely to continue to have on other inmates, I think the nature of his influence on other inmates has been to encourage their prosocial activities in terms of education and to deter their expressions of violence.

In conducting his evaluation, Dr. Cunningham spent an "extensive amount of time," approximately ten hours, directly interviewing the Appellant. During this time, he administered an intelligence test, a personality assessment inventory, and an academic achievement test to the Appellant.[20] Dr. Cunningham also reviewed the Appellant's "prison records, disciplinary, work related prison records" and interviewed family members and prison guards. Dr. Cunningham summarized his findings as follows:

[T]his case is different from many in that he has an established track record in prison across the past twenty-two years. And so there's a significant pattern that can be identified that's specific to his being incarcerated in prison. First he had a single

---

[20]On cross-examination, Dr. Cunningham related that the Appellant had an I.Q. of 87. This would place the Appellant in the lower range of "average" for intelligence.

disciplinary write up across these twenty-two years. [21] He's been productively involved in work roles as an inmate. He has had—continues to have a continuing close relationship with his family.

. . .

First there was a riot in 1986, as I recall, where his actions rather than being ones of inciting or worsening that situation were, in fact, to actively intercede, to keep inmates who were rioting from coming into the death row area, where there was staff that had been trapped.

Richard Austin also has a history of warning staff members of impending trouble or violence from other inmates. This isn't a matter of telling on somebody after the fact in order to get some advantage for himself, but instead, to signal to the officers that something is about to happen so that preventive steps can be taken so that officer is not injured, so that an inmate who was going to act out so doesn't suffer those long term bad consequences. And so that order is maintained on the unit.

He's been involved in directly counseling other inmates against the use of violence. . . . His role as a GED tutor is one of mentoring and positively influencing other inmates. And then the correctional officers . . . in their deposition testimony describing him as having a positive impact on other inmates and their behavior.

In support of his conclusions, Dr. Cunningham noted the Appellant's age, fifty-nine-years-old, and that an "inmate sixty years old is exceedingly unlikely to commit acts of serious violence in prison." Dr. Cunningham also exhaustively discussed statistics regarding inmate behavior and related the Appellant's exemplary and nonviolent behavior since his incarceration.[22]

At the close of the proof, the jury was instructed on the following statutory aggravating factors:

(1) [T]he defendant committed the murder for remuneration, for the promise of remuneration, or employed another to commit the murder for remuneration or the promise of remuneration.

(2) [T]he defendant committed the murder for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another.

The jury was also instructed that it should consider any mitigating circumstances supported by the proof, which may include but are not limited to:

---

[21]This write up involved the Appellant refusing to come out of his cell to work.

[22]We note that Dr. Cunningham's testimony regarding statistics used in formulating his conclusions and records of the Appellant's behavior while in prison were contained in approximately sixty-four pages of typed transcript.

-15-

(1) Any lingering or residual doubt you may have as to whether the defendant is guilty of the crime of which he has been convicted.

(2) The defendant's contributions to prison life through being a positive influence to other prisoners.

(3) The defendant's helpfulness to prison officials or efforts to save the life of guards during a prison riot;

(4) The defendant's relative culpability for the offense.

(5) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense. That is, you shall consider any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

Following submission of the instructions, the jury retired to consider their verdict. After deliberations, the jury found that the State had proven the aggravating circumstance that the defendant committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration beyond a reasonable doubt. The jury further found that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt. In accordance with their verdict, the jury sentenced the Appellant to death for the murder of Julian Watkins.

## I. Disqualification of Tennessee Supreme Court and/or State Attorney General

During the pendency of the re-sentencing hearing, the Appellant filed, in the Shelby County Criminal Court, a "Motion to Disqualify Supreme Court and/or Attorney General from Future Proceedings in this Cause." The substance of the motion was based upon the Appellant's allegation that the Tennessee Supreme Court's constitutional directive to appoint the Attorney General results in a biased tribunal and violates the constitutionally mandated separation of powers. See TENN. CONST. Art. VI, sec. 5; TENN. CODE ANN. § 8-6-101 (1993). Contemporaneously, the Appellant issued subpoenas to the justices of the supreme court; Court of Criminal Appeals Judge Paul G. Summers;[23] Mr. Charles Ferrell, Director, Administrative Office of the Courts; and Attorney General Knox Walkup. The trial court denied the motion and quashed the subpoenas, finding that the motion was premature. This court denied the Appellant's application for extraordinary review pursuant to Tenn. R. App. P. 10, holding that none of the persons subpoenaed had any involvement in the case at the trial level. See State v. Richard Hale Austin, No. 02C01-9811-CR-00341 (Tenn. Crim. App. at Jackson, Nov. 9, 1998). The Tennessee Supreme Court denied the Appellant's application for

---

[23]The Appellant's subpoenas were issued on September 29, 1998. The present Attorney General, Paul G. Summers, was not sworn into office until January 1999.

extraordinary appeal from this court's order. See State v. Richard Hale Austin, No. 02S01-9811-CR-00112 (Tenn. at Jackson, Feb. 1, 1999).

Following the reimposition of the death penalty, the Appellant filed a motion in this court seeking leave to issue subpoenas and take testimony, or, in the alternative, to remand the case to the trial court to take testimony. In his motion, the Appellant asserted that through the issuance of subpoenas he "would be able to develop" the "political interconnectedness" "of the Tennessee Supreme Court and the present Attorney General, Honorable Paul Summers." He alleged that the present Attorney General is a "favorite son" of the supreme court and a "de facto employee" "beholden to the court." Essentially, the Appellant argued that the circumstances surrounding the appointment of Paul Summers as Attorney General are crucial "to proving a due process violation as to the lack of an unbiased and impartial Supreme Court." This court denied the Appellant's motion, finding that this court was without jurisdiction to entertain the motion. See State v. Richard Hale Austin, No. W1999-00281-CCA-R3-PD (Tenn. Crim. App. at Jackson, Dec. 3, 1999). Additionally, this court noted that "a claim involving disqualification or recusal of the Tennessee Supreme Court" may not appropriately be considered by either the trial court or this court. Id. (citing Tenn. Sup. Ct. R. 10, Canon 3(E)(1)(a); State v. Benson, 973 S.W.2d 202 (Tenn. 1998) (allegations of judge's impartiality or bias concerning a party or a party's lawyer must be brought to the attention of the judge(s) so challenged)).

The Appellant now complains of the prior rulings of the trial court and this court. Specifically, he alleges that had he been permitted to develop proof at the hearing before the trial court, he

would have been able to demonstrate that the Supreme Court instructed Mr. Knox Walkup, who at the time was Attorney General, to resign, telling him that he would not be reappointed. Furthermore, the proof would have demonstrated that the Court had previously made a private agreement to appoint Mr. Paul Summers as the next Attorney General, notwithstanding the fact that the Supreme Court publicly asserted it had a purportedly neutral selection process to select a new Attorney General. All of these facts demonstrate the political interconnectedness of the Supreme Court and the Attorney General.

As determined by prior panels of this court and by the trial court in this matter, this court is unable to undertake review of the Appellant's challenge. Although the Appellant raises constitutional claims against Tennessee's method of selecting the Attorney General, in essence, the Appellant seeks recusal of the current Justices of the Tennessee Supreme Court based on their "favoritism" toward current Attorney General Summers. Indeed, his argument before this court, as in his prior motions, appears to assert approval of former Attorney General Walkup. Thus, this court will treat this issue as one addressing the supreme court's recusal and not as a constitutional challenge to the method of appointment.

The right to a fair trial before an impartial tribunal is a fundamental constitutional right. See Benson, 973 S.W.2d at 205 (citing Chapman v. California, 386 U.S. 18, 23 n. 8, 87 S. Ct. 824, 828 n. 8 (1967) (internal citations omitted)). Article VI, § 11 of the Tennessee Constitution provides that "[n]o Judge of the Supreme of Inferior Courts shall preside on the trial of any cause in the event of which he may be interested." Benson, 973 S.W.2d at 205. The purpose of this constitutional provision is to guard against the prejudgment of the rights of litigants and to avoid situations in which the litigants might have cause to conclude that the court had reached a prejudged conclusion because of interest, partiality, or favor. Id. (citing Chumbley v. People's Bank & Trust Co., 57 S.W.2d 787, 788 (Tenn. 1933)). A judge's determination of whether he or she will disqualify him or herself from sitting in a case is a matter within that judge's discretion. See generally Kinard v. Kinard, 986 S.W.2d 220 (Tenn. App. 1998); Young v. Young, 971 S.W.2d 386 (Tenn. App. 1997); State v. Connors, 995 S.W.2d 146 (Tenn. Crim. App. 1995); Wiseman v. Spaulding, 573 S.W.2d 490, 493 (Tenn. App. 1978)(citing State of Tenn. ex rel. Phillips v. Henderson, Warden, 423 S.W.2d 489 (Tenn. 1968)). Thus, the Appellant's motion must be brought to the attention of the justices whom he has challenged. See generally Tenn. Sup. Ct. R. 10, Canon 3(E)(1)(a). Cf. Holder v. Tennessee Judicial Selection Commission, 937 S.W.2d 877, 879 (Tenn. 1996) (justices disqualified themselves prior to hearing); Pierce v. Tharp, 461 S.W.2d 950, 953-54 (Tenn. 1970), cert. denied, 402 U.S. 929, 91 S. Ct. 1527 (1971) (motion to recuse justices should have been brought after certiorari was granted but before argument heard); Chumbley v. People's Bank & Trust Co., 57 S.W.2d at 787 (supreme court justices determined propriety of own recusal); Hooker v. Sundquist, No. 01A01-9709-CH-00533 (Tenn. at Nashville, Feb. 16, 1999) (motion to recuse justices filed after application for permission to appeal filed).

Neither the trial court nor this court has the prerogative or authority to arrive at any conclusion regarding the alleged impartiality or bias of each challenged justice. The Appellant has yet to present the motion to the supreme court. He is not yet precluded from presenting his challenge to the court and may properly file his motion after the court has accepted review of his case. Although no precise procedure is contemplated by the Canons nor established through case law, the accepted practice when seeking the disqualification of a judge is through the filing of a motion for recusal with supporting affidavits of prejudice. See generally 46 AM. JUR.2D *Judges* §§ 194-214(1994 & Supp. 2000). There is no authority for the issuance of subpoenas, or any other discovery procedures, in support of one's motion to disqualify a judge. Id.

Accordingly, for the reasons set forth herein, we decline the Appellant's invitation to disqualify the justices of the Tennessee Supreme Court from participation in the review of his appeal. The Tennessee Supreme Court is the proper court before whom the Appellant's complaint should to be lodged.

## II. Jury Selection Process

### A. *Individual Voir Dire*

Immediately prior to the Appellant's trial, the Shelby County case of State v. William Groseclose and Ronald Rickman was retried. The Groseclose/Rickman case was, similarly, a

twenty-two-year old retrial of a murder for hire. On retrial, both Groseclose and Rickman received life sentences. The "new" sentences were reported by the media as well as the public's adverse response to the more lenient sentences. Based on these events, counsel requested individual voir dire of prospective jurors for the purpose of determining the impact of any collateral consequences stemming from the Groseclose/Rickman verdicts. The trial court denied the request. The Appellant now contends that his rights to an impartial jury and due process were violated as guaranteed by the Sixth and Fourteenth Amendment of the United States Constitution.

The prevailing practice is to examine jurors collectively. State v. Jefferson, 529 S.W.2d 674, 681 (Tenn. 1975); State v. Oody, 823 S.W.2d 554, 563 (Tenn. Crim. App. 1991); State v. Hopper, 695 S.W.2d 530, 539 (Tenn. Crim. App. 1985). Indeed, even in a capital case, there is no requirement that death qualification of a capital jury must be conducted by individual, sequestered voir dire. State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1999) (citing State v. Smith, 857 S.W.2d 1, 19 (Tenn.), cert. denied, 510 U.S. 996, 114 S. Ct. 561 (1993); State v. Porterfield, 746 S.W.2d 441, 447 (Tenn.), cert. denied, 486 U.S. 1017, 108 S.Ct. 1756 (1988)). Moreover, as a general rule, it is within the trial court's discretion to allow individual voir dire of prospective jurors. Stephenson, 878 S.W.2d at 540 (citing State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993), cert. denied, 510 U.S. 1215, 114 S. Ct. 1339 (1994); State v. Harris, 839 S.W.2d 54, 65 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S. Ct. 1368 (1993)). The ultimate goal of voir dire is to insure that jurors are competent, unbiased and impartial, State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S. Ct. 743 (1995); Howell, 868 S.W.2d at 247, and "[i]ndividual voir dire is mandated only when there is a 'significant possibility' that a juror has been exposed to potentially prejudicial material." Howell, 868 S.W.2d at 247; Harris, 839 S.W.2d at 65 (citing Porterfield, 746 S.W.2d at 447). The mere fact that prospective jurors know something about a case at the time of impaneling is not unusual, nor is it sufficient to invoke individual voir dire, where the trial court takes the necessary steps to ensure that the accused receives a fair trial by a panel of impartial and indifferent jurors.

The record does not reflect that the re-sentencing of the Appellant was going to be a high profile case. Indeed, the record reveals that only one juror had to be removed for cause because he had already formed an opinion about the case, this juror also being the victim's cousin. Additionally, although defense counsel introduced as exhibits newspaper articles regarding the Groseclose/Rickman re-sentencing, defense counsel failed to question the jurors about the impact of this case on the Appellant's re-sentencing. Irregardless of defense counsel's failure, the media attention paid to the Groseclose/Rickman case is of little import regarding the necessity of individual voir dire in the present case. We cannot conclude that pretrial knowledge of matters arising from unrelated crimes mandates individual voir dire. Cf. State v. Mann, 959 S.W.2d 503, 531 (Tenn. 1997) (Appendix) (jurors do not live in a vacuum). Any concerns which may remain regarding the impact of publicity arising from the Groseclose/Rickman re-sentencing were dispelled by the trial judge's instruction to the venire:

You must base your verdict only upon the law that is presented here in court. I mean the evidence as presented here in court through witnesses that are placed under oath, exhibits, and the law that I charge you.

And the reason I'm touching on that now is that [you] cannot base [your] decision upon what you might have heard somewhere or what you might have read in the newspapers. And the attorneys will touch on this later, but I'm sure each of you understand, that we cannot have our judicial system operate based upon what we've seen or heard or any preconceived ideas.

The jury is presumed to follow the instructions of the court. Accordingly, we cannot conclude that the trial court abused its discretion in denying individual voir dire. See generally Porterfield, 746 S.W.2d at 446-47 (if no prejudicial information is elicited during voir dire and if the jurors assert they can disregard the pretrial publicity, there is no error in denying individual voir dire). This issue is without merit.

### B. Rehabilitation of Jurors

The Appellant next contends that he was denied an impartial jury because the trial court denied the Appellant the opportunity to rehabilitate potential jurors who were excused for cause on motion of the State because of their opposition to the death penalty. Specifically, the Appellant challenges the removal for cause of Jurors Hilliard, Eslahi, Buffaloe, Massey, Brown, and Corken, and of Alternate Jurors Brooks and Hudson.

Tenn. R. Crim. P. 24(b) gives the trial judge the right to excuse a juror for cause without examination of counsel. State v. Hutchinson, 898 S.W.2d 161, 167 (Tenn. 1994), cert. denied, 516 U.S. 846, 116 S. Ct. 137 (1995) (citing State v. Alley, 776 S.W.2d 506 (Tenn. 1989); State v. Strouth, 620 S.W.2d 467, 471 (Tenn. 1981), cert. denied, 455 U.S. 983, 102 S. Ct. 1491 (1982)). In determining when a prospective juror may be excused for cause because of his or her views on the death penalty, the standard is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985). The Supreme Court further observed that "this standard likewise does not require that a juror's biases be proved with 'unmistakable clarity.'" Id. However, the trial judge must have the "definite impression" that a prospective juror could not follow the law. Hutchinson, 898 S.W.2d at 167 (citing Wainwright v. Witt, 469 U.S. at 425-26, 105 S. Ct. at 853). Finally, the trial court's finding of bias of a juror because of his or her views concerning the death penalty are accorded a presumption of correctness, and the Appellant must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn that decision. Alley, 776 S.W.2d at 518.

The challenged removals for cause were based on the following responses by the respective jurors when questioned whether they could "sign [their] name to a verdict sentencing the defendant to death":

JUROR HILLIARD: No. . . . I don't believe in [the death penalty]. . . . I would stand by my own [personal convictions.]

JUROR ESLAHI: No, sir. . . . That's correct, [I don't believe in the death penalty] . . . I would have to stand by my personal feelings.

JUROR BUFFALOE: No. . . . I would have to refuse.

JUROR MASSEY: Well, let me say it like this, when it come [sic] to the death penalty, if someone else does something, if somebody say that, I'm in favor of the death sentence. Sure. But I can't sit there and sign my name to something like that. . . . No. I can't do that.

JUROR BROWN: No. . . . Well, I couldn't determine and just judge and say that I could, you know, give somebody the death penalty. . . . No, I wouldn't [consider the death penalty.]

JUROR CORKEN: . . .I'll make a statement here. All my life I thought I could, but when I really get down to it, I couldn't. I would not be able to vote for the death penalty. That's the truth. . . .

ALTERNATE JUROR BROOKS: I just – I couldn't put anybody to death.

ALTERNATE JUROR HUDSON: I don't think I can do that. . . . I think I would have to stand beside my own personal feelings.

After reviewing the answers of the excluded jurors, we conclude that their answers left "no leeway for rehabilitation." Strouth, 620 S.W.2d at 471; see also Alley, 776 S.W.2d at 517-18. In each instance, either the court or the prosecutor extensively questioned the prospective jurors as to whether they could apply the law to the evidence and consider all forms of punishment in this case. Each juror was consistent in responding that he or she would not impose the death penalty. These jurors met the standard for dismissal. See Hutchinson, 898 S.W.2d at 167. There is no error.

### C. Jasper Case Hypothetical

As additional error within the voir dire process, the Appellant asserts that the trial court erred by prohibiting questioning of potential Juror Clothier with respect to a recent homicide in Jasper, Texas.[24] By using the Jasper case as a hypothetical, the Appellant asserts that he could have determined whether Juror Clothier would be competent, unbiased and impartial in following the law and capable of rendering a capital verdict in a heinous case. The record does not indicate that the

---

[24]The "Jasper case" involved the dragging death of a forty-nine-year-old African-American man by three members of a white supremacist gang. The African-American man was chained behind a pickup truck and pulled for three miles over a bumpy East Texas road. The incident received nationwide publicity.

trial court prevented defense counsel from questioning Juror Clothier regarding the Jasper, Texas, case.[25] Indeed, the record reveals that Juror Clothier considered the

(continued...)

---

[25]During jury selection, the following colloquy occurred between defense counsel Hutton and potential Juror McMillon:

HUTTON: Well, let's give you an example. There's a real famous one in Texas a couple of days ago. A real horrible case. In a case like that, could you impose the death penalty where somebody –

JUROR McMILLON: Nope.

HUTTON: —drags somebody to death?

JUROR McMILLON: Nope.

After further voir dire examination of potential Juror McMillon, the court excused Juror McMillon for cause and was replaced by potential Juror Clothier. The following voir dire of this juror ensued:

GENERAL HENDERSON: The law says in Tennessee and I believe the judge will tell you at the end that if the State proves at least one aggravating circumstance beyond a reasonable doubt, and we prove the aggravating circumstance outweighs any mitigating evidence in the case beyond a reasonable doubt, and law says the punishment shall be death. If you find yourself in that situation where we've proven that aggravating circumstance beyond a reasonable doubt, and we've proven that it outweighs any mitigating evidence beyond a reasonable doubt, would you be able to sign your name to a verdict imposing the death penalty?

JUROR CLOTHIER: I don't think I could.

GENERAL HENDERSON: Okay. And again, it's not something most people think about in their ordinary course of life. You understand that under certain circumstances the law says the punishment shall be death?

JUROR CLOTHIER: Yes.

GENERAL HENDERSON: If you were a part of the jury and found this was one of those cases where the law . . . says the punishment shall be death, would you be able to follow that law and sign your name to the verdict or would you stand by your own personal feelings and say, no. I can't do that. . . .

JUROR CLOTHIER: Even though I felt like that maybe death was deserved in that specific case, because of my religious beliefs, I'm not sure that I could actually sign – sign something to put someone else to death.

GENERAL HENDERSON: And that's why I bring it up. A lot of people say sometimes they think that they're in favor of the death penalty or that they think it's a good thing, but in Tennessee we require all twelve jurors to sign their name to a piece of paper sentencing the defendant to death by electrocution. And we're looking for twelve people who can do that . . . . [D]o you think you can do that?

JUROR CLOTHIER: I don't know that I can in this case. . . . [N]o. I cannot.

Texas case when formulating her responses to General Henderson. Additionally, defense counsel did include the Jasper, Texas, reference in his questioning of the potential juror. Thus, it is unclear how the court denied defense counsel from making reference to the Jasper, Texas, hypothetical. This claim is without merit.

### D. Examination as to Juror's Belief in the Bible

Finally, within his many claims regarding the impaneling of an impartial jury, the Appellant claims that "[t]he trial court committed error in refusing to allow questioning of whether prospective Juror Scott's belief in the Bible would impact her ability to render a fair decision." During voir dire examination, potential Juror Scott stated, "Well, all the decisions I make are based upon the Bible, because I believe it to be the truth." Juror Scott continued to explain, "I believe that in certain circumstances [the death penalty] is warranted." She added that her religious beliefs would not affect her decision regarding the Appellant. Defense counsel then inquired:

> . . . Can you put aside your beliefs in the Bible, and the Bible as you believe it, I'm
> not challenging that. I respect everybody's opinion on that. Can you put that aside

---

[25](...continued)
GENERAL HENDERSON: Is there anything about this case, would it make any difference what case it was?

JUROR CLOTHIER: I don't know. **I mean they brought up the Jasper, Texas, thing. I think that's terrible. And I think that person probably does deserve death. But I don't know that if I was on that jury that I could sign it.**

. . .

THE COURT: Mr. Hutton, let me let you address this juror.

MR. HUTTON: Ms. Clothier, I don't want to sound like a tape recorder. . . but I think it's more important that jurors ultimately realize that they are the judges. Okay? The State never tells you, you must impose the death penalty. . . .
Unless you personally believe that an aggravator found by all of you outweighs any mitigation that you find. The mitigation doesn't have to be proved by everybody. Anything put forth in the evidence that you believe is mitigating, you have the right as a juror to weigh against what the State had proved as an aggravator.
. . .
So my question is, can you think of a case, **where like the Jasper murder case**, where you could do that? Where you could find, well, this is a horrible crime. It's a horrible murder. There's nothing I find that's mitigating. And therefore, I could give the death sentence.
And I mean, it doesn't have to be every case. Doesn't have to be many cases. The question is, can you think of a possibility? **Say the Jasper case**. Or you know, if a close relative were murdered. . . .

(Emphasis Added). At this time, the State objected to defense counsel's voir dire asserting that "[t]hat's an impossible hypothetical. If a close relative were murdered, she wouldn't be on the jury." The court then regained control of voir dire and asked Ms. Clothier, "Would you be open to considering all forms of punishment?" Juror Clothier replied affirmatively. General Henderson, again, posed the question to Clothier as to whether she would be able to sign her name to a verdict imposing death. Clothier replied that she could not. The juror was then excused.

-23-

in this case or after hearing the proof, do you have a belief that when you go back in the jury room somehow what's in the Bible is going to impact the decision that you give to Mr. Austin in this case?

The State objected and the court sustained, holding "You can ask their general philosophy. I think the Constitution would prohibit you from inquiring into religious preferences." Under the authority of Morgan v. Illinois, 504 U.S. 719, 112 S. Ct. 2222 (1992), the Appellant contends that, since Juror Scott stated that everything she does is guided by the Bible, he had an absolute right to determine whether or not her religious beliefs in the Bible would affect her decision in the present case.

The right to question venire members is not unlimited, but must, of necessity, be limited to inquiries that are material and relevant to the specific case being tried. See generally Layman v. State, 429 S.W.2d 832, 836 (Tenn. Crim. App. 1968). Generally, a trial court may properly limit inquiry into a venire member's religious beliefs in those instances where religious issues are expressly presented in the case, where a religious organization is a party to the litigation or where the inquiry is a necessary predicate to the exercise of peremptory challenges. See generally Yarborough v. United States, 230 F.2d 56, 63 (4th Cir. 1956), cert. denied, 351 U.S. 969, 76 S. Ct. 1034 (1956); Brandborg v. Lucas, 891 F. Supp. 352 (E.D. Tex. 1995); State v. Via, 704 P.2d 238, 248 (Ariz. 1985), cert. denied, 475 U.S. 1048, 106 S. Ct. 1268 (1986); Coleman v. United States, 379 A.2d 951, 954 (D.C. Ct. App. 1977); Rose v. Sheedy, 134 S.W.2d 18, 19 (Mo. 1939); Corey Schriod Smith v. State, No. CR-95-0205 (Ala. Crim. App. Aug. 25, 2000). Indeed,

As to religion, our jury selection system was not designed to subject prospective jurors to a catechism of their tenets of faith, whether it be Catholic, Jewish, Protestant, or Mohammedan, or to force them to publicly declare themselves to be atheists. Indeed, many a juror might have a real doubt as to the particular religious category into which they could properly place themselves.

United States v. Barnes, 604 F.2d 121, 141 (2d Cir. 1979), cert. denied, 446 U.S. 907, 100 S. Ct. 1833 (1980).

The trial court, in the exercise of its discretion, controls the questions that can be asked to keep the voir dire within relevant bounds. In the present case, we conclude that the trial court properly restricted counsel from delving into the juror's religious beliefs. The prospective juror previously stated that her religious beliefs would not affect her decision in the present case. Accordingly, any foray into her religious convictions was irrelevant as having no direct relationship to the parties involved in the matter or the issues presented at re-sentencing. Additionally, any error by the court in restricting voir dire is negated by the Appellant's use of a peremptory strike against potential juror Scott coupled with his failure to exercise all peremptory challenges. See generally Ross v. Oklahoma, 487 U.S. 81, 83-87, 108 S. Ct. 2273, 2276-2277, reh'g denied, 487 U.S. 1250, 109 S. Ct. 11 (1988) (defendant's use of peremptory challenge against challenged prospective juror waived complaint against juror on appeal). Accordingly, the Appellant is not entitled to relief as to this claim.

### III. Refusal to Admit Hearsay Into Evidence

The Appellant next challenges the court's exclusion of testimony during the re-sentencing hearing. Specifically, the Appellant argues that the following evidence was erroneously excluded by the trial court (1) the transcript of the 1995 deposition of Jack Charles Blankenship; (2) the March 31, 1977, request for indictment; (3) testimony that the Appellant had reported his vehicle stolen; and (4) testimony of Minister Joe Ingle as to the Appellant's actions during a 1985 prison riot. Relying on Lockett v. Ohio, the crux of the Appellant's argument is based upon the premise that the rules of evidence do not preclude, at a capital sentencing hearing, evidence which establishes or rebuts an aggravating circumstance.[26]

The Appellant is correct in his argument that evidence is not excluded at a capital sentencing hearing merely because the evidence is hearsay. TENN. CODE ANN. § 39-2404(c)[27] (*repealed*) provides:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Tennessee.

Thus, as long as evidence or testimony is relevant to the circumstances of the murder, the aggravating circumstances of the murder, or the mitigating circumstances, and has probative value

---

[26] In death penalty cases, the sentencer may not be precluded from considering any aspect of a defendant's character or record as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S. Ct. 2954, 2964-65 (1978) (plurality opinion); see also Johnson v. Texas, 509 U.S. 350, 361, 113 S. Ct. 2658, 2666 (1993). The United States Supreme Court has held that mitigating evidence is relevant to sentencing hearings and should be heard. See California v. Brown, 479 U.S. 538, 541, 107 S. Ct. 837, 839 (1987); Eddings v. Oklahoma, 455 U.S. 104, 113-15, 102 S. Ct. 869, 876-77 (1982). " '[E]vidence about the defendant's background and character is relevant because of the belief ... that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse.'" Goad v. State, 938 S.W.2d 363, 369 (Tenn.1996) (quoting Brown, 479 U.S. at 545, 107 S. Ct. at 841) (O'Conner, J., concurring)).

[27] The "sentencing law in effect at the time the murder was committed" is the applicable law. State v. Brimmer, 876 S.W.2d 75, 82 (Tenn. 1994), cert. denied, 513 U.S. 1020, 115 S. Ct. 585 (1994).

in the determination of punishment, such evidence is admissible. See State v. Teague, 897 S.W.2d 248, 250 (Tenn. 1995); see also State v. Hall, 8 S.W.3d 593, 602 (Tenn. 1999), cert. denied, – U.S. –, 121 S. Ct. 98 (2000). In other words, "if the offered evidence bears on punishment, it is admissible." Id. The admission of evidence, however, is not without constraints. Evidence may properly be excluded if it is so unduly prejudicial that it renders the trial fundamentally unfair. See State v. Vincent C. Sims, No. W1998-00634-CCA-R3-DD (Tenn. Crim. App. at Jackson, Mar. 14, 2000) (citing State v. Burns, 979 S.W.2d 276, 282 (Tenn. 1998), cert. denied, 527 U.S. 1039, 119 S. Ct. 2402 (1999); State v. Nesbit, 978 S.W.2d 872, 891 (Tenn. 1998), cert. denied, 526 U.S. 1052, 119 S. Ct. 1359 (1999)). Additionally, the admissibility of evidence ultimately is entrusted to the sound discretion of the trial court. State v. Vincent C. Sims, No. W1998-00634-CCA-R3-DD (citing Hutchinson, 898 S.W.2d at 172). Absent an abuse of that discretion, such rulings will not be reversed on appeal. State v. Vincent C. Sims, No. W1998-00634-CCA-R3-DD ( citing State v. Caughron, 855 S.W.2d 526, 541 (Tenn.), cert. denied, 510 U.S. 979, 114 S. Ct. 475 (1993)).

### A. *Transcript of Deposition of Jack Charles Blankenship*

Although Jack Charles Blankenship did not testify at the Appellant's original trial, Blankenship had maintained through subsequent depositions that the Appellant had no involvement in the murder. Specifically, on July 5, 1995, in preparation for a federal habeas corpus proceeding, Blankenship gave a deposition in which he stated that he was not hired by the Appellant to kill Watkins. During the instant re-sentencing hearing, however, Blankenship, in surprise, repudiated his prior statements, explaining that they were false, and stated that he had since "made peace with God" and "he wanted to set the record straight." Blankenship proceeded to implicate the Appellant in the murder for hire of Julian Watkins, corroborating the testimony of co-defendant Terry Casteel. While on the stand, defense counsel thoroughly questioned Blankenship as to the veracity of his prior statements. Blankenship adamantly declared that his prior statements were false and that he was now telling the truth. The defense then sought to introduce into evidence the 1995 deposition of Jack Charles Blankenship as substantive mitigating evidence establishing residual doubt as to the Appellant's involvement in the murder. The trial court refused to permit the reading of the deposition. The court reasoned:

> It was used for purposes of cross-examining and impeachment. So I will allow it to be filed as an exhibit for that limited purpose, but we're not going to read that testimony to the jury. Mr. Glankler read a large portion as far as impeachment of the witness yesterday.

The court then instructed the jury:

> . . . I have allowed the filing . . . of the deposition of Jack Charles Blankenship that was taken in . . . July 1995. You need to understand that this deposition is not evidence in this case. It is not substantive evidence and may not be considered as such. It is being allowed to be filed by the court for its value, if any, concerning the impeachment of the witness. In other words as a prior inconsistent statement if you should consider it as such. You may consider its value, if any, upon the testimony

that was given by Jack Charles Blankenship. So do you understand it is not evidence to be considered concerning Mr. Austin. It's simply being allowed to be filed for its value, if any, on the impeachment of the witness.

The Appellant now contests the court's limitation of the deposition for impeachment purposes alone, arguing that the evidence should have been admitted as substantive evidence. The State concedes that the trial court should have permitted introduction of the deposition as substantive evidence. We agree that the exclusion was error. The excluded evidence was relevant to rebut the aggravating factor that the murder was committed for remuneration and also was relevant to support the Appellant's proffered mitigating proof of residual doubt as to his culpability. Additionally, substantial reasons existed to assume the reliability of the contents of the deposition.

The State contends, however, that any error in limiting its introduction for impeachment purposes only was harmless error under Rule 36(b) of the Tennessee Rules of Appellate Procedure. The Appellant counters that the constitutional error complained of is not harmless under Satterwhite v. Texas, 486 U.S. 249, 108 S. Ct. 1792 (1988).

Unconstitutional error occurring during the course of a judicial proceeding is judged for harm or prejudice under Rule 52(a) of the Tennessee Rules of Criminal Procedure and Rule 36(b) of the Tennessee Rules of Appellate Procedure. Under these rules, a "judgment of conviction shall [not] be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits." Tenn. R. Crim. P. 52(a); see also Tenn. R. App. P. 36(b). The test for harmlessness, however, differs when there is constitutional error. Once constitutional error is found, the burden shifts to the State to prove the error is harmless and the reviewing court must be persuaded "beyond a reasonable doubt" that the error did not affect the trial outcome in order to deem the error harmless. See State v. Nichols, 877 S.W.2d 722, 743 (Tenn. 1994), cert. denied, 513 U.S. 1114, 115 S. Ct. 909 (1995) (Reid, C.J., dissenting); see also Chapman v. California, 386 U.S. at 22, 87 S. Ct. at 827 (holding some constitutional errors are so insignificant or unimportant that they may be deemed harmless). The United States Supreme Court first applied the *Chapman* harmless error analysis to federal constitutional errors occurring in a capital sentencing proceeding in Satterwhite v. Texas, 486 U.S. at 261, 108 S. Ct. at 1800 (holding that admission of expert testimony about the defendant's risk for future dangerousness violated the Sixth Amendment). In finding the error *not* harmless, the Court emphasized that the question is "not whether the legally admitted evidence was sufficient to support the death sentence. . . . But rather, **whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained**.'" Satterwhite, 486 U. S. at 258-259, 108 S. Ct. at 1798 (quoting Chapman, 386 U. S. at 24, 87 S. Ct. at 828) (emphasis added).

We agree with the Appellant that the exclusion of the deposition of Jack Charles Blankenship infringed upon his right to a fair trial, and, thus is evaluated as constitutional error. See generally Green v. Georgia, 442 U.S. 95, 99 S. Ct. 2150 (1979) (exclusion of testimony denied capital defendant a fair trial); State v. Terry, 813 S.W.2d 420, 425 (Tenn. 1991) (when evidence is introduced into the sentencing calculation that potentially undermines the Eighth Amendment

reliability requirement, constitutional harmless error analysis should be employed). Thus, the question remains for this court whether the State can show beyond a reasonable doubt that had the trial court not erred in the exclusion of the deposition of Blankenship the verdict would not have been different.

We conclude that even had the deposition been admitted as substantive evidence, the verdict would not have been affected. Indeed, defense counsel thoroughly questioned Jack Charles Blankenship as to the majority of his deposition testimony. Substantial parts of the deposition were read as a part of the questioning. Blankenship admitted that he had previously made such statements, explaining that his prior statements were false. Although the jury was instructed that it could only receive Blankenship's deposition for impeachment purposes, they were not so instructed as to the portions of the deposition restated in Blankenship's answers at the hearing. Additionally, the fact that Blankenship had consistently, for twenty-two years, denied the Appellant's involvement in the crime was forcefully presented to the jury. For these reasons, we conclude that the trial court's ruling that limited the jury's consideration of the deposition constitutes harmless error.

### B. March 31, 1977 Request for Indictment

The State attempted to prove, as a capital sentencing aggravating factor, that the Appellant commissioned the murder of Julian Watkins in order to avoid prosecution on gambling charges. See TENN. CODE ANN. § 39-2404(i)(6). In an attempt to establish this factor, the State introduced the testimony of Officer Cupp, who testified that Julian Watkins was responsible for investigating the Appellant for gambling and for bringing gambling indictments against the Appellant. On cross-examination, Officer Cupp admitted that a document captioned "Request for Indictments" had been prepared and listed numerous persons who were also arrested with the Appellant on gambling charges. At this time, the defense moved to admit the "Request for Indictment" document as substantive evidence to establish that other persons existed, in addition to the Appellant, who would have had a motive for killing Julian Watkins. The trial court refused to admit the evidence on the grounds that such evidence was hearsay. The Appellant now challenges this ruling.

Although the Appellant is correct in his assertion that the trial court may not exclude evidence at a capital sentencing hearing on the grounds that such evidence is hearsay, he is incorrect in his belief that there are no limitations placed upon the introduction of evidence. The Appellant asserts that the report is probative because it lists other persons arrested on gambling charges that would also have had a motive to murder Julian Watkins. The Appellant's theory is too speculative to be probative. The Appellant failed to offer any evidence that would link any of the other named persons to the murder. Accordingly, without more, the report by itself does not place any doubt as to the Appellant's involvement in the offense. We conclude that the trial court did not err by excluding the "Request for Indictments" document. This claim is without merit.

### C. Appellant's Report of Stolen Vehicle

During the cross-examination of Terry Casteel, the following colloquy occurred:

GLANKLER: All right. You mentioned something to the prosecutor a little earlier on in your testimony that you were going to take this Ms. Marilyn Lee down to her mother's in Greenwood, Mississippi?

CASTEEL: Yes, sir.

GLANKLER: And you took her down in Mr. Austin's Cadillac?

CASTEEL: Yes, sir.

GLANKLER: You had the keys to that automobile?

CASTEEL: Yes, sir.

GLANKLER: You had driven that car on numerous occasions?

CASTEEL: Yes, sir.

GLANKLER: And Mr. Richard Austin called the Memphis Police Department and reported his car stolen, did he not?

GENERAL HENDERSON: Objection, Your Honor. That would call for a hearsay or a conclusion or speculation.

THE COURT: Overruled. If he knows.

CASTEEL: I was told that he did. Yes.

THE COURT: Sustained. Hearsay.

GLANKLER: What?

THE COURT: Sustained. Hearsay.

GLANKLER: If the Court please, we are entitled to ask that question.

THE COURT: Sustained. Hearsay.

GLANKLER: Thank you.

The Appellant contends that it was error for the trial court to prohibit introduction of testimony relating that he had reported his vehicle stolen to the police department on the basis that such testimony was hearsay. He asserts that this testimony "was probative in that it rebutted the

aggravating circumstances of murder for hire, and murder to avoid prosecution. . . ."  Specifically, he states that:

> proof that Austin reported his car stolen by Casteel, directly rebuts the State's theory that Austin hired Casteel and Blankenship to kill Watkins.  If Austin and Casteel were in collusion, planning the murder of Watkins, Austin certainly would not have alerted the police to be on the lookout for Casteel.  The jury was thus prevented from considering valuable mitigation proof that weakened the State's theory that Austin orchestrated the killing of Watkins.

Although in a capital sentencing hearing, such evidence may not be excluded on the basis that it is hearsay, we conclude that any error in the court's ruling that the testimony was hearsay is harmless as "the error complained of did not contribute to the verdict obtained." Satterwhite, 486 U. S. at 258-259, 108 S. Ct. at 1798.  First, the trial court offered no curative instruction to the jury to disregard the excluded testimony.  Additionally, the record does not reveal what the Appellant intended to be introduced.  Defense counsel asked Casteel if the Appellant had reported his vehicle stolen to which Casteel replied affirmatively.  There is no indication in the record that the vehicle was stolen prior to the murder.  Nor did the defense make an offer of proof of such.  See generally Tenn. R. Evid.  103(a)(2) & (b).  The jury obviously heard Casteel's testimony that the Appellant had reported his car stolen and the trial court failed to instruct the jurors to disregard this fact.  As such, we conclude that any error in its exclusion was clearly harmless.

### D.  Reverend Ingle's Testimony

As mitigation proof, the Appellant presented the deposition testimony of two former prison guards, Hardin Green and John Owen.  Both Green and Owen provided statements regarding the Appellant's actions during the prison riot of 1985.  Specifically, both men explained how the Appellant protected prison guards during the riot.  During this particular insurrection, inmates in the general population had started a riot and gained control of the interior of the prison.  The inmates on death row heard the rioting prisoners. Encouraged by the prisoners' uprising, "Steve Pickle," a death row inmate, started a fire on death row. Meanwhile, inmates from the general population were trying to gain access to death row.  The Appellant cautioned the inmates from the general population, "we don't need you in here. We don't want you in here, we don't want our officers hurt, we are appealing our stuff and you are going to sentence us to the death penalty if you come in here. . . ."  Both Hardin Green and John Owen opined that the Appellant not only saved their lives that day but also the lives of the five other officers assigned to death row.

The Appellant also presented the testimony of Reverend Joseph Ingle, a United Church of Christ minister involved with prison ministry.  He explained that he has had a pastoral relationship with the Appellant for almost twenty-two years. In addition to relating information about the Appellant, Reverend Ingle was asked to recall the prison riot of 1985.  Reverend Ingle replied that his knowledge of the riot was gained through conversations with John Owen, who at that time was one of the commanders of the shift on death row.  Reverend Ingle recalled that the death row inmates were not involved in the riot, rather, the inmates in the general population had instigated the uprising.

He continued that inmates in the general population tried to "storm death row" in order to free the death row inmates. Reverend Ingle was then asked whether any of the prison guards had expressed to him "any thanks or gratefulness to [the Appellant]." He answered affirmatively, noting that Lieutenant Owen, in particular, had expressed gratitude. The State objected. The trial court sustained the objection, finding "Mr. Owen has testified. I'm not going to allow this man to simply compound testimony that's either been given or hearsay. Objection is sustained." The Appellant now challenges the trial court's ruling.

We conclude that the trial court's limitation of Reverend Ingle's testimony was proper under these circumstances. Although testimony relating to the Appellant's character was highly relevant in making a sentencing determination, the trial court does retain discretion and control of the presentation of evidence. The substance of the excluded testimony was already introduced through the thorough depositions of two prison guards who actually observed the Appellant's behavior. Reverend Ingle's testimony was merely cumulative of first hand observer testimony. Under these circumstances, we conclude that the trial court did not abuse its discretion in excluding Reverend Ingle's testimony. This issue is without merit.

### IV. Admission of Testimony of the Appellant's Prior Threats of Violence

Marilyn Lee Pryor, an employee at The Golden Cue in May 1977, testified regarding statements made by the Appellant shortly after the April raid. Specifically, she stated that the Appellant remarked to her that "[Watkins] should have his brains shot out." Additionally, she described events occurring immediately after the murder of Julian Watkins. Ms. Pryor related that she was questioned by Memphis Police Officers regarding the Appellant's "whereabouts" and was informed that she would be subpoenaed to come to court to give a statement. Later that same day, the Appellant told her not to worry about the subpoena. The following morning the Appellant arranged for Ms. Pryor to be driven to her home in Mississippi. The next day, unbeknownst to the Appellant, Ms. Pryor returned to Memphis, gave her statement, and returned to Mississippi.

The State then inquired as to whether she had spoken to the Appellant after providing authorities with her statement in 1977. Over defense objection, Ms. Pryor testified that, when she later told the Appellant that "[she] had testified for the State," [provided a statement], the Appellant "told [her] that [she] was a stupid, cold, bitch and that [she] should have been killed, too. . . ." The Appellant now complains that admission of this testimony was error. Specifically, he contends that

> [s]uch threats would be inadmissible under Rule 608(b) of the Tennessee Rules of Evidence since such conduct is not probative of truthfulness or untruthfulness. Furthermore, the testimony was highly prejudicial because allowing the jury to hear that Mr. Austin had previously threatened her would only inflame the jury and the concern substantially outweighed any probative value the testimony had.

-31-

The Appellant's reliance on the Rules of Evidence is misplaced. First, we again acknowledge that, at a capital re-sentencing hearing,

> evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background, history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and any evidence tending to establish or rebut any mitigating factors. **Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence,** provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. . . .

TENN. CODE ANN. § 39-2404(c). Generally, evidence of threats against witnesses attributed to the accused is probative as being either (1) conduct inconsistent with the accused's claim of innocence or (2) conduct consistent with the theory that the making of such threats evinces a consciousness of guilt. See generally NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.01[13] (4th ed. 2000) (citing State v. Maddox, 957 S.W.2d 547, 552 (Tenn. Crim. App. 1997); Tillery v. State, 565 S.W.2d 509 (Tenn. Crim. App. 1978)). At the basis of the Appellant's mitigation theory was evidence tending to negate his culpability for the offense. Thus, testimony relating that the Appellant would have preferred that Ms. Pryor be killed, rather than provide testimony relating to activities surrounding the murder of Julian Watkins, was evidence probative to rebut the defense theory of mitigation and to establish residual doubt of the Appellant's guilt. Accordingly, the testimony was properly admitted and we find no error.


### V. Cross-examination of Witness Levi Haywood

During the re-sentencing hearing, defense counsel presented the testimony of Levi Haywood, who testified that he had met Terry Casteel at the Shelby County Jail. Casteel informed Haywood that he had been beaten and coerced into testifying against the Appellant. Haywood continued to state that Casteel regretted his role as a prosecuting witness and asserted that the Appellant had not been involved in the murder. On cross-examination, Haywood admitted that he had previously "omitted" that Casteel had been beaten by the police in his recitation of his dealings with Casteel. The examination continued to reveal that Casteel was considered to be a "snitch" because he had implicated the Appellant. The following colloquy ensued:

GENERAL CAMPBELL: What happens to snitches, Mr. Haywood?

HAYWOOD: That all depends.

GLANKLER: Object.

COURT: Overruled.

GENERAL CAMPBELL: What happens to snitches in the jail?

HAYWOOD: It all depends. I wasn't a snitch and I almost got stabbed by a plumber because an officer said that I killed somebody.

GENERAL CAMPBELL: What happens to a snitch, Mr. Haywood, in prison?

HAYWOOD: In prison?

GENERAL CAMPBELL: Yeah.

HAYWOOD: They may get beat up. They may get put on segregated lock up. It all depends.

GENERAL CAMPBELL: They may get killed, too?

HAYWOOD: Yeah, they might.

The Appellant now contends that the trial court erred in permitting into evidence Haywood's testimony about "[w]hat happens to snitches in the jail." Specifically, he contends that the testimony is "speculative and irrelevant" and should not have been admitted into evidence.

> Again, at a capital sentencing hearing,
>
> evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background, history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and **any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence,** provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. . . .

TENN. CODE ANN. § 39-2404(c). Under these criteria, the State may properly introduce reliable testimony probative to rebut any mitigating circumstance advanced by the defense. In the present case, the Appellant sought to introduce "residual doubt" evidence to rebut the murder for

remuneration aggravating circumstance.[28] Specifically, he presented the testimony of Levi Haywood to relate that Terry Casteel had only implicated the Appellant in the murder because Casteel was physically intimidated by the police. The State then sought to explain Casteel's motive in explaining to Haywood and other inmates as to why he testified against the Appellant. Evidence regarding the treatment of "snitches" was, therefore, probative in explaining Casteel's differing justification of his testimony to Haywood.[29] Accordingly, we find no error in permitting the introduction of such evidence. This claim is without merit.

## VI. Fifth Amendment Rights of Jack Charles Blankenship

Prior to the re-sentencing hearing, defense counsel obtained a writ of habeas corpus ad testificandum to bring Jack Charles Blankenship to Memphis to testify. Upon arriving in Memphis, Blankenship consulted with his attorney and was advised to assert his Fifth Amendment privilege against self-incrimination. At the re-sentencing hearing, Blankenship invoked his Fifth Amendment privilege upon being called to the stand. The trial court found that Blankenship's Fifth Amendment privilege had expired in the present case because his conviction for his criminal involvement in Watkins' murder was final and he was not subject to further prosecution. As such, the court ordered Blankenship to testify. Blankenship proceeded to testify, corroborating the testimony of Terry Casteel and recanting his previous testimony which exculpated the Appellant. The Appellant now contends that the court unconstitutionally compelled Blankenship's testimony.

A criminal defendant lacks standing to complain of the violation of a third party's Fifth Amendment privilege against self-incrimination. See, e.g., United States v. Tribunella, 749 F.2d 104, 106 n.1 (2d Cir. 1984); United States v. Minor, 398 F.2d 511, 513 (2d Cir. 1968); People v. Jenkins, 997 P.2d 1044, 1089 (Cal. 2000), petition for writ of cert. filed, (Oct. 24, 2000); People v. Homes, 654 N.E.2d 662, 668 (Ill. App. 1995). The Fifth Amendment privilege is personal and cannot be vicariously asserted. Rogers v. United States, 340 U.S. 367, 371, 71 S. Ct. 438, reh'g denied, 341 U.S. 912, 71 S. Ct. 619 (1951). The Appellant was not compelled to testify; Blankenship was. Only Blankenship, and not the Appellant, may assert a violation of the privilege. Whatever the merit of the Appellant's claim may be, the Appellant has no standing to assert the alleged violation of the Fifth Amendment privilege of Blankenship. Accordingly, we need not address the merits of the Appellant's complaint.

---

[28]"Residual doubt" evidence is not "a fact about the defendant or the circumstances of the crime, but is a state of mind somewhere between reasonable doubt and absolute certainty of guilt." Teague, 897 S.W.2d 253 (citing State v. Bigbee, 885 S.W.2d 797, 813 (Tenn. 1994)). "Residual doubt" evidence is admissible at a capital re-sentencing hearing where the evidence relates directly to a mitigating factor or rebuts the State's proof as to an aggravating factor. Teague, 897 S.W.2d at 253 ("[p]rohibiting evidence regarding the extent to which the defendant did or did not participate in the commission of the crime would defeat in large measure the defendant's right to present evidence denying, explaining or rebutting evidence of aggravating circumstances).

[29]The test for admissibility is not whether the evidence tends to prove the defendant did or did not commit the crime, but, whether it relates to the circumstances of the crime or the aggravating or mitigating circumstances. See Teague, 897 S.W.2d at 252.

## VII. Introduction of Victim Impact Evidence

In State v. Nesbit, 978 S.W.2d at 872, our supreme court held that "victim impact evidence and argument is [not] barred by the federal and state constitutions." See also Payne v. Tennessee, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991) (holding that the Eighth Amendment erects no *per se* bar against the admission of victim impact evidence and prosecutorial argument); State v. Shepherd, 902 S.W.2d 895, 907 (Tenn. 1995) (holding that victim impact evidence and prosecutorial argument is not precluded by the Tennessee Constitution). Notwithstanding the holding that victim impact evidence is admissible under Tennessee's death penalty sentencing scheme, the introduction of such evidence is not unrestricted. Nesbit, 978 S.W.2d at 891. Victim impact evidence may not be introduced if (1) it is so unduly prejudicial that it renders the trial fundamentally unfair; or (2) its probative value is substantially outweighed by its prejudicial impact. See Nesbit, 978 S.W.2d at 891 (citations omitted); see also State v. Morris, 24 S.W.3d 788, 813 (Tenn. 2000) (Appendix), cert. denied, – U.S.–, 121 S. Ct. 786 (2001). Additionally, our supreme court has established certain procedural guidelines which must be followed before victim impact evidence may be admitted by the trial court. First, the State must notify the trial court of its intent to produce victim impact evidence. Nesbit, 978 S.W.2d at 891. Second, upon receiving the State's notification, the trial court must hold a hearing outside the presence of the jury to determine the admissibility of the evidence. Id. Finally, the trial court should not permit introduction of such evidence until the court determines that evidence of one or more aggravators is already present in the record. Id. (citations omitted).

At the re-sentencing hearing, the State presented the testimony of the victim's wife and sons. Their testimony included, but was not limited to, evidence as to the emotional loss sustained by the family as the result of Julian Watkins' murder. The Appellant challenges admission of this victim impact evidence on grounds that (1) the testimony resulted in great risk of undue prejudice; and (2) the trial court failed to properly follow the procedural requisites established by the supreme court in Nesbit. As to the latter ground, the Appellant specifically asserts that the trial court permitted the State to call Carolyn Watkins-Cupp, the victim's wife, as its first witness; thereby, violating the prerequisite that evidence of an aggravating circumstance must already be present in the record. Coupled with his challenge to the admission of the victim impact evidence, the Appellant additionally claims as error the prosecutor's remarks during closing argument regarding the function of victim impact evidence.

### A. Admission of Victim Impact Testimony

The Appellant's challenge to the introduction of victim impact evidence is expressly limited to the testimony of Carolyn Watkins-Cupp and Steve Watkins. Carolyn Watkins-Cupp, the first witness to be called by the State, testified that she was the widow of Julian Watkins. She related that they had been married for sixteen and one-half years at the time of his murder and that they had three children together. Ms. Watkins-Cupp explained that the loss of her husband "devastated" their family and her children had difficulty in understanding why "their daddy was no longer there." She further added that his death forced her to close their business. Steve Watkins, the victim's youngest

son, was the final witness called by the State. Steve Watkins testified that his father's death "put a big emptiness in my life. I mean, from up eight - - up to eight years, you know, you don't remember a whole lot. But since then I've – I think of it every day. It's just a big emptiness I wish could be filled that never will be ever again."

The victim impact evidence complained of is limited to the victim's role as father and husband and to the loss felt by the victim's immediate family members. Such testimony is clearly of the nature of evidence contemplated in Nesbit. See generally State v. Smith, 993 S.W.2d 6, 17 (Tenn. 1999), cert. denied, 528 U.S. 1023, 120 S. Ct. 536 (1999). The evidence was limited to that which offered a "brief glimpse into the life of the individual who has been killed, the contemporaneous circumstances surrounding the victim's death, and how those circumstances financially and emotionally impacted the members of the victim's immediate family. See Nesbit, 978 S.W.2d at 891 (citations omitted). The fact that the death of a loved one is devastating requires no proof. See Morris, 24 S.W.3d at 813 (Appendix). Moreover, we reject the Appellant's claim that the testimony of Steve Watkins was merely cumulative of other victim impact testimony and, therefore, overly prejudicial. Steve Watkins testified as to the impact of his father's death on him and, generally, on the family. We fail to find such testimony cumulative. Accordingly, we cannot conclude that the admission of the victim impact testimony was unduly prejudicial.

Before admitting the testimony of both Carolyn Watkins-Cupp and Steve Watkins, the State notified the trial court of its intent to introduce victim impact evidence and the court conducted jury-out hearings to determine the admissibility of the evidence. Notwithstanding compliance with these prerequisites, the trial court permitted the victim's widow to testify as the State's first witness. Obviously, no proof of aggravating circumstances existed in the record prior to her testimony; thus, Nesbit's third requirement was not fulfilled. The State contends and this court agrees that the failure to comply with the third requirement of Nesbit requiring proof of an aggravating circumstance on the record prior to the admission of the victim impact testimony of Carolyn Watkins-Cupp is harmless in the present case.

The State presented the testimony of Carolyn Watkins-Cupp not only to present victim impact evidence but also to establish the discovery of her husband's murder and the surrounding circumstances. Before Carolyn Watkins-Cupp testified, the trial court held a jury-out hearing to determine the admissibility of her testimony. At the conclusion of the hearing, the trial court stated, in relevant part:

> I have listened to the opening statements. I realize they're not proof. But the only other possibility would be to have Ms. Watkins testify twice. And I don't think that would be essentially in the interest of judicial economy.

We cannot conclude that the trial court's ruling was reversible error. A trial judge is in the unique position of not only being responsible for the admissibility of evidence but also of being responsible for the orderly and expeditious presentation of testimony. See generally State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). As such, we are unable to conclude that the presentation

of Carolyn Watkins-Cupp's testimony before evidence of an aggravator was present in the record rendered the capital sentencing process fundamentally unfair. Accordingly, we hold any error harmless. See Tenn. R. Crim. P. 52(a).

### B. Prosecutor's Closing Argument

The Appellant also contends that the prosecutor engaged in improper closing argument regarding the function of victim impact evidence upon the jury. Specifically, he avers that the prosecutor instructed the jury on how it was to weigh the victim impact evidence in relation to the mitigation evidence offered by the Appellant in direct violation of the supreme court's mandate in State v. Nesbit, 978 S.W.2d at 894. Indeed, in Nesbit, the supreme court cautioned that victim impact evidence "does not carry the force of and effect of an aggravating circumstance in the sentencing calculation." Nesbit, 978 S.W.2d at 894. Accordingly, victim impact evidence may not be classified as such and the jury may not be instructed to weigh and balance the victim impact evidence against mitigating proof. Id.

> The relevant portion of the prosecutor's closing argument is as follows:
> . . . When you weigh the aggravating factors, there's not any question, there's not any contest about this being a murder for hire or a contract killing or anything like that. The only question is about the motive. The only question is the aggravating circumstances. You weigh the mitigating fact he's been able to behave on death row. Hasn't hurt anybody else since he's been on death row. He hasn't hurt anybody himself anyway. He would pay somebody to do that.
>
> **But you are also required to consider, and I know you will consider, the impact of this crime, the impact of this murder, the twenty-two years of pulling the strings behind the scenes.**
>
> And it still goes on. Why else – why else would you – why else do you sentence someone. How do you weigh this? How do you weigh that? You don't have any scales back there. And say, okay, we'll put a picture of his grandchild in this one and we'll put a picture of Julian Watkins on this side of the scale and see if they weigh out. You can't do that.
>
> You weigh the aggravating and mitigating factors, it sounds corny, but you weigh them in your heart. You weigh them in here.
>
> And you make the decision based on what this tells you. Is this one of those cases where it's really pretty minimum? A minimum punishment. Is this one of those cases where he has gone too far for too long. Is this one of these cases where there's something inside the human heart that says this is too much. You've done too much. You've gone too far. . . .

(emphasis added).  Contrary to the Appellant's assertion, we fail to ascertain how this argument translates into an argument instructing the jury on how to weigh the victim impact evidence in relation to mitigation proof offered by the Appellant.  The prosecutor merely commented to the jury that they were required to consider the "impact of this crime."  The prosecutor did not characterize, in any way, the victim impact evidence as an aggravating factor.  We cannot conclude that this argument by the prosecutor prejudiced the outcome of the sentencing phase.  Accordingly, we find no error in the State's closing argument.  This claim is without merit.

### VIII.  Prosecutorial Misconduct during Closing Argument

In his next argument, the Appellant contends that the State violated his right to a fair trial by arguing matters not in evidence during closing argument.   Specifically, he asserts that the State:

crafted a blatantly false motive for Austin to kill Watkins, by arguing to the jury that [the Appellant] would have lost his amusement license and thus could no longer operate The Golden Cue.  However, [the Appellant] never held an amusement license, and there was put forward no proof by the State that he ever did have such a license.

As asserted by the State, the Appellant failed to make a contemporaneous objection to the prosecutor's statements during closing argument. See State v. Green, 947 S.W.2d 186 (Tenn. Crim. App. 1997);  State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App.1992) (failure to object to prosecutor's alleged misconduct during closing argument waives later complaint).  The failure to object to the prosecutor's statements results in waiver on appeal. See generally State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999) (citing Tenn. R. App. P. 36(a)).  Because the issue was procedurally defaulted, we decline review of its merits.

### IX.  Refusal to Instruct Jury as to Sentences Received by Co-Defendants

The Appellant argues that numerous constitutional rights were violated by virtue of the trial court's failure to instruct the jury to consider the sentences received by co-defendants Terry Casteel and Jack Charles Blankenship as non-statutory mitigating circumstances.[30]  The trial court refused to so instruct the jury, finding:

. . . [U]nder the statutory definition of accessory before the fact, it says, the sentence may be, and I'm paraphrasing, I don't even have it in front of me, may be life or death.  And then that extra line follows that.  It says, regardless of punishment for the

---

[30]The record reveals that co-defendant Casteel received a twenty-year sentence and co-defendant Blankenship received a sentence of life imprisonment.

principal or other people involved. And as a result of that statutory scheme, I felt it's inappropriate to bring that up. And as a result, I did not put it in there.[31]

Conceding that the statute provides that an accessory may receive a more severe sentence than the principal, the Appellant maintains that this fact does not preclude consideration of the punishments received by co-defendants as a mitigating factor in determining the appropriate sentence for an accessory before the fact. In support of his position that sentences received by equally culpable defendants be instructed as a mitigating circumstance, the Appellant relies upon our supreme court's opinion in State v. Odom, 928 S.W.2d 18 (Tenn. 1996), and the fact that the federal capital sentencing provisions expressly provide that the non-death sentences received by equally culpable defendants may be considered as a mitigating factor. See 18 U.S.C.S. § 3592(a)(4) (Law. Co-op. 2000 Supp.).

In State v. Odom, our supreme court held that, although TENN. CODE ANN. § 39-2-204(e)(1)(1991), requires trial courts "to instruct the jury on any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing, or both, " "neither the United States Constitution nor the Tennessee Constitution requires the trial judge to read or submit non-statutory mitigating circumstances to the jury." Id. at 28-30. The trial court, additionally, noted that the law prior to 1989, TENN. CODE ANN. § 39-2-203(e) (1982), did not require that non-statutory mitigating factors be expressly instructed. Odom, 928 S.W.2d at 29 (citations omitted); see also Smith, 993 S.W.2d at 32, (Appendix) (Odom's interpretation of TENN. CODE ANN. § 39-2-204(e)(1) not applicable to sentence imposed under prior sentencing law).

Because the offense for which the Appellant was convicted was committed in 1977, the supreme court's interpretation of TENN. CODE ANN. § 39-2-204(e)(1), involving post-1989 capital convictions, has no application to this case. The sentencing law in effect at the time of the offense, i.e., TENN. CODE ANN. § 39-2404 (e), did not require that the jury be instructed as to non-statutory mitigating circumstances.[32] See Smith, 993 S.W.2d at 32 (§ 39-2-203(e) does not require instruction

---

[31]TENN. CODE ANN. § 39-2407 provides:
Any person tried and convicted as an accessory before the fact of murder in the first degree shall be punished by life imprisonment or by death under the provisions of Tennessee Code Annotated, Sections 39-2402, 39-2404, 39-2405 and 39-2406, and said trial and sentence shall not depend on when or if the principal is convicted nor on the punishment actually imposed on said principal.

[32]TENN. CODE ANN. § 39-2404(e) provides:
After closing arguments in the sentencing hearing, the trial judge shall include in his instructions for the jury to weigh and consider any mitigating circumstances and any of the statutory aggravating circumstances set forth in subsection (i) of this section which may be raised by the evidence at either the guilt or sentencing hearing, or both. These instructions and the manner of arriving at a sentence shall be given in the oral charge and in writing to the jury for its deliberations.

on non-statutory mitigating circumstances).[33]   Accordingly, we conclude that the trial court did not err in refusing to instruct the jury as to the sentences received by the Appellant's co-defendants as such an instruction was neither statutorily nor constitutionally required.[34]

## X.  Refusal to Instruct Jury as to Sentence of Life Without Parole

The Appellant asserts that he was entitled to have the jury instructed as to the sentencing option of life without the possibility of parole.  In 1993, the General Assembly amended the capital sentencing statutes to provide for the sentence of life imprisonment without the possibility of parole. State v. Keen, 31 S.W.3d 196, 213 (Tenn. 2000), petition for cert. filed, (Dec. 5, 2000) (citing 1993 Tenn. Pub. Acts ch. 473).  It is well established that prior to 1993 the only punishments available for a person convicted of first degree murder were life imprisonment and death.  See Keen, 31 S.W.3d at 213; State v. Cauthern, 967 S.W.2d 726, 735 (Tenn. 1998), cert. denied, 525 U.S. 967, 119 S. Ct. 414 (1998); see also State v. Bruce C. Reliford, No. W1999-00826-CCA-R3-CD (Tenn. Crim. App. at Jackson, Oct. 2, 2000).  Although the Appellant's offense was committed prior to the effective date of the act, he asserts that he is entitled to an instruction on life without the possibility of parole because his sentencing hearing on remand occurred after the act was passed.  Specifically, in support of his position, the Appellant advances the following arguments:

(1) A sentencing scheme that does not offer a sentence of life without the possibility of parole cannot be relied upon to reflect a properly guided and reasoned decision that death is the most appropriate punishment;

(2) A sentencing scheme that does not permit consideration of life without the possibility of parole infringes upon evolving standards of decency protected by the federal and state constitutions;

(3) A death sentence returned under a sentencing scheme which requires juries to sentence defendants to the death penalty in order to incapacitate the defendants from committing further crimes constitutes excessive punishment; and

(4) Refusal to permit consideration of life without the possibility of parole violates rights to equal protections of the laws.

---

[33]TENN. CODE ANN. § 39-2404(e) is verbatim TENN. CODE ANN. § 39-2-203(e).  Thus, the same analysis is applied.

[34]Although we find it unnecessary to address the Appellant's contention that sentences received by co-defendants are a valid non-statutory mitigating circumstance, a determination of whether the circumstance is mitigating would be a cognizable issue had the 1989 Criminal Sentencing Act been applicable.  See generally Odom, 928 S.W.2d at 30-32.  Additionally, while we take no position as to this determination, the Appellant is correct that under the Federal Death Penalty Act the circumstance that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death" is a statutorily enumerated mitigating factor.  18 U.S.C.S. § 3592(a)(4).

While we respect the Appellant's arguments in support of this claim, we note that the identical arguments were recently rejected by our supreme court in State v. Keen, 31 S.W.3d at 213-219. Accordingly, as we are bound by the precedent established by the supreme court, we find it unnecessary to revisit the arguments recently dismissed by the court. This claim is without merit.

## XI. Refusal to Instruct Jury Regarding Parole Eligibility

During jury deliberation, the jury submitted a question to the court asking "how long is a life sentence and if there is any possibility of parole." After consulting with both the State and defense counsel, the trial judge explained to the jury that, "once a jury starts its deliberations, the trial judge is extremely limited on his involvement. . . ." The judge continued that he was "not at liberty" to respond to their question and that the law to be applied had already been charged. The jury resumed deliberations at 9:35 a.m. and returned a verdict of death at 1:50 p.m..

The Appellant now complains that, under the authority of Simmons v. South Carolina, 512 U.S. 154, 114 S. Ct. 2187 (1994), the trial court's failure to answer the jury's question violated virtually every constitutional right belonging to a capital defendant. As advanced by the State, our supreme court reviewed and rejected this very same argument under almost identical circumstances in State v. Bush, 942 S.W.2d 489, 503 (Tenn.), cert. denied, 522 U.S. 953, 118 S. Ct. 376 (1997).

In State v. Bush, the jury sent a note to the court fifteen minutes after deliberations began asking, "How many years does the [defendant] serve if he gets life imprisonment and how long before parole?" The trial court instructed the jury, "parole eligibility is not an issue in a capital case. . . ." In approving the trial court's response, our supreme court noted that, in Simmons, the Supreme Court held that due process only required an instruction that the defendant is parole ineligible "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole." Bush, 942 S.W.2d at 503 (citing Simmons, 512 U.S. at 155-156, 114 S. Ct. at 2190). The Supreme Court added that the Court would not "second-guess the refusal of a State to allow proof, instruction, or argument to the jury on the availability of parole" "[i]f parole *is* an option for a defendant sentenced to life imprisonment." Bush, 942 S.W.2d at 503 (citing Simmons, 512 U.S. at 168-169, 114 S. Ct. at 2196; see also Simmons, 512 U.S. at 175-177, 114 S. Ct. at 2200 (O'Connor, J., concurring) (parenthetical omitted)). Under the reasoning provided in Simmons, our supreme court held that "[s]ince Tennessee is a state in which defendants sentenced to life imprisonment are eligible for parole, Simmons does not require that the jury be given information about parole availability." Bush, 942 S.W.2d at 503. This position is supported by other decisions of the court "holding that the after-effect of a jury's verdict, such as parole availability, is not a proper instruction or consideration for the jury during deliberations."[35] Bush, 942 S.W.2d at

---

[35]The Bush court did expressly recognize, however, the new sentencing option of life without the possibility of parole effective July 1, 1993. See Bush, 942 S.W.2d at 503 n.8. The court also acknowledged another part of the legislative enactment requiring the jurors now be instructed "that a defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty-five full calendar years of such sentence." Id. In addition, jurors must be informed that "a defendant who receives a sentence of imprisonment

(continued...)

503 (citing Caughron, 855 S.W.2d at 543; State v. Payne, 791 S.W.2d 10, 21 (Tenn. 1990), aff'd by, 501 U.S. 808, 111 S. Ct. 2597 (1991) (internal footnote omitted)). This issue is without merit.

## XII.  Whether Aggravator (i)(4) Violates State v. Middlebrooks

The Appellant was found guilty of accessory before the fact to first degree murder. An "accessory before the fact" is "[a]ny person who shall feloniously move, incite, counsel, hire, command, or procure any other person to commit a felony. . . ." TENN. CODE ANN. § 39-107. In imposing a sentence of death in this case, the jury found that "[t]he defendant committed the murder for remuneration or the promise of remuneration, or employed another to commit the murder for remuneration or the promise of remuneration." TENN. CODE ANN. 39-2404(i)(4). The Appellant now contends that the evidence used to convict him as an accessory before the fact to first degree murder duplicated that used to support the aggravating factor in TENN. CODE ANN. § 39-2404(i)(4) (employing another to commit the murder for the promise of remuneration). Relying upon State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), the Appellant asserts that the duplication of facts to support both the conviction and sentence does not achieve the constitutionally required "narrowing" of death eligible defendants. See Zant v. Stephens, 462 U.S. 862, 877, 103 S. Ct. 2733 (1983) (aggravating factor must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder").

In State v. Middlebrooks, 840 S.W.2d at 346, our supreme court held that, when a defendant is convicted of felony murder, the aggravating circumstance set out in TENN. CODE ANN. § 39-13-204(i)(7)(murder committed while committing certain enumerated felonies) does not narrow the class of death eligible murderers sufficiently under the Eighth Amendment to the United States Constitution and Article I, § 16 of the Tennessee Constitution "because it duplicates the elements of the offense." See State v. Hall, 958 S.W.2d 679, 692 (Tenn. 1997), cert. denied, 524 U.S. 941, 118 S. Ct. 2348 (1998). The court reasoned that all participants in a felony murder, regardless of the degree of culpability, enter the sentencing stage of the trial with at least one aggravating factor against them because the aggravating factor duplicates the elements of the offense. Middlebrooks, 840 S.W.2d at 343 (quotation omitted).

The Appellant applies this same analysis to the (i)(4) aggravating factor when the conviction is based upon "accessory before the fact." The State acknowledges that this court, in the Appellant's fourth petition for post-conviction relief, rejected this identical issue and argues that, although not the "law of the case," this court should apply the same analysis in this direct appeal. See Richard H. Austin v. State, No. 02C01-9310-CR-00238 (Tenn. Crim. App. at Jackson, May 3, 1995), perm. to appeal denied, (Tenn. Nov. 6, 1995). The Appellant responds that this court misapplied the supreme court's decision in State v. Stephenson in determining that the Appellant had no

_____

[35](...continued)
for life without possibility of parole shall never be eligible for release on parole." Id. (citing TENN. CODE ANN. § 39-13-204(e)(2)).

Middlebrooks issue. Specifically, he asserts that the Stephenson analysis is not germane to the present issue because the Stephenson court based its decision on the criminal responsibility statute, a different underlying statute than this court is faced with today. After re-examination of the issue, we remain convinced that our previous rationale is correct and the same analysis applies.

In State v. Stephenson, 878 S.W.2d at 557, the defendant was convicted of first degree murder by employing another to kill his wife. Stephenson's conviction was based on his role in the killing under the criminal responsibility statute, TENN. CODE ANN. § 39-11-402(2) (1991), and the death sentence was based solely on the aggravating factor involving murder for remuneration or promise of remuneration. TENN. CODE ANN. § 39-13-204(i)(4) (1991). The defendant claimed that the constitutionally required narrowing of death eligible offenders was not achieved because of the duplication of facts to support the conviction and the death sentence. Our supreme court disagreed, noting that the defendant stood convicted of first degree premeditated murder, which is defined as an "intentional, premeditated and deliberate killing of another." TENN. CODE ANN. § 39-13-202(a)(1) (1991). The conviction was based on the criminal responsibility statute, TENN. CODE ANN. § 39-11-402(2), which provides:

> A person is criminally responsible for an offense committed by the conduct of another if:
> Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense. . . .

The supreme court concluded that "the statutory aggravating circumstance found by the jury is a proper narrowing device because it provides a 'principled way in which to distinguish' the cases in which the death penalty is imposed from the many cases in which it is not. . . ." Stephenson, 878 S.W.2d at 557. The court reasoned:

> The aggravating circumstance - the defendant employed another to commit the murder for remuneration or the promise of remuneration - does not duplicate the elements of the offense, even incorporating the criminal responsibility statutes. Constitutional narrowing is accomplished because at the sentencing hearing, the State was required to prove that this defendant hired someone to kill his wife, or promised to pay someone to kill his wife. *Obviously, not every defendant who is guilty of first-degree murder pursuant to the criminal responsibility statutes has also hired another or promised to pay another to commit the murder.* Thus, the aggravating circumstance found by the jury in this case narrows the class of death-eligible defendants as required by State v. Middlebrooks, *supra.*

Id. at 557 (emphasis added).

As noted in this court's decision in Richard H. Austin v. State, No. 02C01-9310-CR-00238, the Appellant's conviction was premised on a theory of criminal responsibility for the conduct of

another, although not expressly designated as such at the time.[36]  Specifically, the Appellant was convicted of accessory before the fact to first degree murder.  An accessory before the fact" is "[a]ny person who shall feloniously move, incite, counsel, hire, command, or procure any other person to commit a felony. . . ." TENN. CODE ANN. § 39-107.  Applying the Stephenson rationale, not every person who is convicted as an accessory before the fact to first degree murder has also hired another or promised to pay another to commit the murder.[37]  Accordingly, as in Stephenson, we conclude that the aggravating factor enumerated in TENN. CODE ANN. § 39-2404(i)(4) achieves the constitutionally required narrowing of death eligible defendants even where the conviction is based on the defendant's role as an accessory before the fact.  See Owens v. State, 13 S.W.3d 742, 764-765 (Tenn. Crim. App. 1999), perm. to appeal denied, (Tenn.), cert. denied, – U.S.–, 121 S. Ct. 116 (2000).  For these reasons, the Appellant is denied relief on this claim.


## __XIII.  Propriety of Court's Refusal to Impose Life Sentence Due to Twenty-year Delay

The Appellant asserts that the twenty plus years delay in imposing the death penalty has eviscerated any justification for carrying out the sentence of death; therefore, execution of this sentence at this point would constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution.  The United States Supreme Court declined to review a similar issue in Lackey v. Texas, 514 U.S. 1045, 115 S. Ct. 1421 (1995), petition for reh'g denied, 520 U.S. 1183, 117 S. Ct. 1465 (1997) (whether executing

---

[36]Under the law existing at the time of this offense, an accessory before the fact was deemed a principal offender and punished as such.  See  TENN. CODE ANN. § 39-108.  This code section, in addition to TENN. CODE ANN. § 39-109 (defining aiders and abettors), was subsequently repealed and replaced by the criminal responsibility statute.  See  TENN. CODE ANN. § 39-11-402.  Indeed, "[s]ubdivision (2) [of TENN. CODE ANN. § 39-11-402] sets forth the conduct of defendants formerly known as accessories before the fact and aiders and abettors."  Sentencing Commission Comments, TENN. CODE ANN. § 39-11-402.

[37]Additionally, we acknowledge that the Appellant raised the identical claim in his federal habeas corpus petition.  The District Court for the Middle District of Tennessee rejected the claim, holding that the Appellant's "allegation of a Middlebrooks violation fails to present a cognizable federal claim."  Austin v. Bell, 938 F.Supp. 1308, 1326 (M.D. Tenn. 1996).  Nonetheless, the district court proceeded to address the issue on its merits, concluding

> [a]ccording to the law in effect at the time of Julian Watkins' murder, an accessory before the fact was deemed a principle offender and punished as such.  See TENN. CODE ANN. § 39-108 (*repealed* 1989).  Because not every defendant who is guilty of first-degree murder pursuant to the criminal responsibility statute has also hired another person to commit the murder, however, the aggravating circumstance that Petitioner's jury found did narrow the class of death-eligible defendants in accordance with Middlebrooks.  Stephenson, 878 S.W.2d at 557.  Therefore, the aggravating circumstance that Petitioner's jury found did narrow the class of death-eligible defendants in accordance with Middlebrooks.

Austin v. Bell, 938 F.Supp. at 1327.

a prisoner who has already spent seventeen years on death row violates the Eight Amendment's prohibition against cruel and unusual punishment). Notwithstanding, Justice Stevens, joined by Justice Breyer, filed a memorandum, emphasizing that a denial of certiorari was not a ruling on its merits and noting his belief that this concern should be further explored. Lackey v. Texas, 514 U.S. at 1045, 115 S. Ct. at 1421. Specifically, Justice Stevens recognized that the delay in the execution of judgments imposing the death penalty frustrates the two principal social purposes of the penalty, *i.e.*, retribution and deterrence. Lackey, 514 U.S. at 1045, 115 S. Ct. at 1421 (Stevens, J., respecting denial of certiorari). In so stating, Justice Stevens invited the state and federal courts to "serve as laboratories in which the issue [may] receive further study before it is addressed by this Court." Id. at 1045, 115 S. Ct. at 1421 (citing McCray v. New York, 461 U.S. 962, 963 103 S. Ct. 2438, 2439 (1983)).

The issue was again presented to the Court in Knight v. Florida, 528 U.S. 990, 120 S.Ct. 459 (1999). Justice Thomas, writing separately in the court's denial of certiorari, opined:

> . . .I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed. Consistency would seem to demand that those who accept our death penalty jurisprudence as a given also accept the lengthy delay between sentencing and execution as a necessary consequence. . . . It is incongruous to arm capital defendants with an arsenal of "constitutional" claims with which they may delay their executions, and simultaneously to complain when executions are inevitably delayed. . . .

Knight v. Florida, _ U.S. at _, 120 S. Ct. at 459-60 (Thomas, J., concurring in denial of certiorari) (citations omitted). Justice Thomas, notably, revisited Justice Stevens previous invitation for the lower courts to serve as "laboratories" in which the viability of this claim could receive further study. He emphasized that, since Justice Stevens' invitation, the lower courts have "resoundingly rejected the claim as meritless." Id. at 461, 120 S. Ct. at 461 (citing People v. Frye, 959 P.2d 183, 262 (Cal. 1998), cert. denied, 526 U.S. 1023, 119 S. Ct. 1262 (1999); People v. Massie, 967 P.2d 29, 44-45 (Cal. 1998), cert. denied, 526 U.S. 1113, 119 S.Ct. 1759 (1999); Ex parte Bush, 695 So.2d 138, 140 (Ala. 1997); State v. Schackart, 947 P.2d 315, 336 (Ariz. 1997), cert. denied, 525 U.S. 862, 119 S. Ct. 149 (1998); Bell v. State, 938 S.W.2d 35, 53 (Tex. Crim. App. 1996), cert. denied, 522 U.S. 827, 118 S. Ct. 90 (1997); State v. Smith, 931 P.2d 1272, 1287-88 (Mont. 1996), cert. denied, 522 U.S. 965, 118 S. Ct. 410 (1997); White v. Johnson, 79 F.3d 432, 439-40 (C.A.5), cert. denied, 519 U.S. 911, 117 S. Ct. 275 (1996); Stafford v. Ward, 59 F.3d 1025, 1028 (C.A. 10 1995)). A panel of this court similarly dismissed the claim without review. See State v. Charles Eddie Hartman, No. M1998-00803-CCA-R3-DD (Tenn. Crim. App. at Nashville, May 17, 2000).

After consideration of the Appellant's claim, we perceive no constitutional violation under either the federal or the Tennessee constitution. We remain unconvinced that neither this state's capital sentencing law nor the accompanying subsequent appellate review of a capital conviction was

enacted with a purpose to prolong incarceration in order to torture inmates prior to their execution. As in most cases, the delay in the instant case was caused in large part by numerous appeals and collateral attacks lodged by the Appellant. This issue is without merit.

## XIV. Constitutional Challenges to Death Penalty

The Appellant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions. The challenges raised by the Appellant have been previously examined and rejected by case law decision. The body of law upholding the constitutionality of Tennessee's death penalty provisions, specifically, that rejecting the claims currently raised by the Appellant, is recited as follows:

1. Tennessee's death penalty statutes meaningfully narrow the class of death eligible defendants; specifically, the statutory aggravating circumstances set forth in TENN. CODE ANN. § 39-2-203(i)(2), (i)(5), (i)(6), and (i)(7) provide such a meaningful basis for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death.[38] See State v. Vann, 976 S.W.2d 93, 117-118 (Tenn. 1998) (Appendix), cert. denied, 526 U.S.1071, 119 S.Ct. 1467 (1999); Keen, 926 S.W.2d at 742.

2. The death sentence is not capriciously and arbitrarily imposed in that

> (a) The prosecutor is not vested with unlimited discretion as to whether or not to seek the death penalty. See State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995), cert. denied, 519 U.S. 847, 117 S. Ct. 133 (1996).

> (b) The death penalty is not imposed in a discriminatory manner based upon economics, race, geography, and gender. See Hines, 919 S.W.2d at 582; Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 23.

> (c) Standards or procedures for jury selection exist to insure open inquiry concerning potentially prejudicial subject matter See Caughron, 855 S.W.2d at 542.

> (d) The death qualification process does not skew the make-up of the jury and does not result in a relatively prosecution prone guilty-prone jury. See State v. Teel, 793 S.W.2d 236, 246 (Tenn.), cert. denied,

---

[38]We note that factors (i)(2), (i)(5), (i)(6), and (i)(7) do not pertain to this case as they were not relied upon by the State. Thus, any individual claim with respect to these factors is without merit. See, e.g., Hall, 958 S.W.2d at 715; Brimmer, 876 S.W.2d at 87.

498 U.S. 1007, 111 S. Ct. 571 (1990); State v. Harbison, 704 S.W.2d 314, 318 (Tenn.), cert. denied, 470 U.S. 1153, 106 S. Ct. 2261 (1986).

(e) Defendants are not unconstitutionally prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, *i.e.*, the cost of incarceration versus cost of execution, deterrence, method of execution. See Brimmer, 876 S.W.2d at 86-87; Cazes, 875 S.W.2d at 268; Black, 815 S.W.2d at 179.

(f) There is no constitutional violation when the jury is instructed that it must agree unanimously in order to impose a life sentence, and is not told the effect of a non-unanimous verdict. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 22-23.

(g) Requiring the jury to agree unanimously to a life verdict does not violate Mills v. Maryland and McKoy v. North Carolina. See Brimmer, 876 S.W.2d at 87; Thompson, 768 S.W.2d at 250; State v. King, 718 S.W.2d 241, 249 (Tenn. 1986), superseded by statute as recognized by, Hutchinson, 898 S.W.2d at161.

(h) The jury is required to make the ultimate determination that death is the appropriate penalty. See Brimmer, 876 S.W.2d at 87; Smith, 857 S.W.2d at 22.

(i) The defendant is not denied closing argument in the penalty phase of the trial. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 269; Smith, 857 S.W.2d at 24; Caughron, 855 S.W.2d at 542.

3. The appellate review process in death penalty cases is constitutionally adequate. See Cazes, 875 S.W.2d at 270-71; Harris, 839 S.W.2d at 77. Moreover, the supreme court has recently held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." See State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997), cert. denied, 523 U.S. 1083, 118 S. Ct. 1536 (1998).

Based upon the above case decisions, the appellant's constitutional challenges to Tennessee's death penalty statutes are rejected.

## XV. Proportionality of Sentence

Finally, this court is required to consider whether the Appellant's sentence of death is disproportionate to the penalty imposed in similar cases. See TENN. CODE ANN. §39-13-206(c)(1)(D). If the imposition of a death sentence in the appealed case is "plainly lacking in circumstances with

those in similar cases in which the death penalty has previously been imposed," the sentence of death will be deemed disproportionate. See Bland, 958 S.W.2d at 665. However, just because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence does not *per se* require a finding of disproportionality. Id. at 665. Thus, it is not the duty of the appellate court to "assure that a sentence less than death was never imposed in a case with similar characteristic," but to "assure that no aberrant death sentence is affirmed." Id.

In conducting our review, we begin with the presumption that the sentence of death is proportionate with the crime of first degree murder. See Hall, 958 S.W.2d at 699; see also State v. Tony Carruthers & James Montgomery, No. W1997-00097-SC-DDT-DD (Tenn. at Jackson, Dec. 11, 2000). Second, while there is no mathematical or scientific formula involved, this court, in comparing similar cases, should consider: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victim's treatment during the killing; (6) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. See Vann, 976 S.W.2d at 107 (citing Bland, 958 S.W.2d at 667). When reviewing the characteristics of the defendant, we consider (1) the defendant's prior record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. Id.

Moreover, in conducting our review, "we select from the pool of cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." State v. Tony Carruthers & James Montgomery, No. W1997-0097-SC-DDT-DD (citing Bland, 958 S.W.2d at 666) (emphasis added). Thus, we reject the Appellant's argument that his sentence is disproportionate based upon the lesser sentences imposed upon his co-defendants, Jack Charles Blankenship and Terry Casteel. Cf. State v. Tony Carruthers & James Montgomery, No. W1997-0097-SC-DDT-DD at fn. 53 (sentences received for first degree murder irrelevant in proportionality determination where sentence result of plea negotiations). Additionally, we note the Appellant's misplaced reliance upon Nuthill v. State, 30 Tenn. (11 Hum.) 247 (1850), holding that an accessory could not receive a greater punishment than the principal. At the time of the present offense, Tennessee law provided that the punishment imposed upon an accessory before the fact of murder in the first degree is not dependant upon the sentence imposed upon the principal offender. See TENN. CODE ANN. § 39-2407.

The circumstances surrounding the present murder in light of the relevant comparative factors reveal that the victim, a reserve deputy sheriff, agreed to work undercover with local law enforcement to expose illegal gambling activities. The victim, Julian Watkins, became associated with the Appellant at the Appellant's place of business through his undercover role and the two men engaged in various forms of gaming. As a result of the undercover investigation, the Appellant and many others were indicted on numerous charges of illegal gambling activity. Soon thereafter, the Appellant arranged for an escaped convict, Jack Charles Blankenship, to murder the victim for $980 and a case

of beer. Blankenship, accompanied by Terry Casteel, the Appellant's associate, drove to the victim's automobile repair shop. Blankenship, acting as a potential customer, lured the unsuspecting victim onto the parking lot under the pretense of examining Blankenship's automobile. While the victim leaned over to inspect the vehicle, Blankenship shot and killed the victim. The murder was clearly premeditated.

The Appellant had no prior criminal history at the time of the murder. There is no evidence that he was mentally or emotionally impaired during any period of time surrounding the murder. The Appellant presented mitigating evidence attesting to his many admirable attributes and contributions to the prison community since his incarceration. Additionally, despite the Appellant's claim of his minor role in the murder, the record reveals that the murder would not have occurred but for the Appellant's initiative and planning. The record also reveals that the Appellant has not cooperated with authorities nor does the record indicate the Appellant's remorse for the death of Julian Watkins. Although the Appellant's psychologist testified that an "inmate sixty years old is exceedingly unlikely to commit acts of serious violence in prison," we cannot conclude that the Appellant's behavior while in prison or his present age negates the circumstances of this murder or exempts him from that class of defendants for whom the death penalty is an appropriate punishment. While no two capital cases and no two defendants are alike, we have reviewed the circumstances of the present case with similar first degree murder cases and conclude that the penalty imposed in the present case is not disproportionate to the penalty imposed in similar cases. See, e.g., Hutchinson, 898 S.W.2d at 161 (death penalty affirmed based upon (i)(4) aggravator, where defendant and others had arranged to kill decedent to collect $800,000 in life insurance proceeds); Porterfield, 746 S.W.2d at 441 (death penalty affirmed based upon (i)(4) and (i)(5) aggravating circumstances, where defendant solicited Porterfield to murder husband); State v. Coker, 746 S.W.2d 167 (Tenn. 1987), cert. denied, 488 U.S. 871, 109 S. Ct. 180 (1988) (death penalty affirmed based upon aggravating circumstances (i)(2) and (i)(4), where defendant arranged for murder of paramour's husband); State v. Groseclose and Rickman, 615 S.W.2d 142 (Tenn.), cert. denied, 454 U.S. 882, 102 S. Ct. 366 (1981) (death penalty found proportionate based upon (i)(4) and (i)(5) aggravators where defendant solicited Rickman to murder wife; upon re-sentencing on other grounds, life sentence imposed). Additionally, the sentence of death has consistently been found proportionate where only one aggravating factor is found. E.g., State v. Sledge, 15 S.W.3d 93 (Tenn.), cert. denied, _ U.S. _, 121 S. Ct. 211 (2000) (prior violent felony); Hall, 8 S.W.3d at 593 (heinous, atrocious, cruel); State v. Middlebrooks, 995 S.W.2d 550 (Tenn. 1999) (heinous, atrocious, cruel); State v. Matson, 666 S.W.2d 41 (Tenn.), cert. denied, 469 U.S. 873, 105 S. Ct. 225 (1984) (felony murder); State v. Caldwell, 671 S.W.2d 459 (Tenn.), cert. denied, 469 U.S. 873, 105 S. Ct. 231 (1984) (prior violent felony).

Our review of these cases reveals that the sentence of death imposed upon the Appellant is proportionate to the penalty imposed in similar cases. In so concluding, we have considered the entire record and reach the decision that the sentence of death was not imposed arbitrarily, that the evidence supports the finding of the (i)(4) aggravating circumstance, that the evidence supports the jury's finding that the aggravating circumstance outweighs mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

## Conclusion

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstance, and the jury's finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A)(C). A comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we affirm the sentence of death imposed by the trial court.

_____
DAVID G. HAYES, JUDGE